No. 21,966.

*In re* The Trusteeship of LILLIAN M. PRAGER (LILLIAN· M. PRAGER, *Appellant and Appellee*, v. STADDEN S. HART et al., *Appellees and Appellants*).

### SYLLABUS BY THE COURT.

1. TRUSTS AND TRUSTEES—*Trustee Charged with Dereliction of Duty— Trustee Not Responsible for Negligence of Prior Trustee.* A testatrix devised one-third of her estate to a trustee, for the benefit of designated beneficiaries. A portion of the estate consisted of a large credit on the books of a wholesale grocery company, one-third of which became vested in the trustee. The debt was not collected from the grocery company, the trustee resigned, and a successor was appointed. Some fourteen years after her appointment, the second trustee made application to be relieved from office, and for approval of the account she presented. The beneficiaries objected to the account, accused the trustee of divers derelictions of duty, and sought to have her account charged with various sums, including the grocery-company debt in full. Her account showed collection of thirty-six per cent of the sum due from the grocery company. The court found the grocery company was solvent at the date of her appointment, and found she could have collected the full amount of the debt from the grocery company and from her predecessor, within a reasonable time after her appointment. *Held*, it was no fault of the trustee that the debt was not collected before her appointment; she can be held responsible for none but her own delinquency; and the measure of her duty in the premises was good faith and reasonable prudence and diligence.

Prager v. Hart.

2. SAME—*Solvency of Grocery Company—Improper Evidence.* The first trustee testified that when he resigned he was solvent, and testified that the grocery company was solvent and could have been compelled to pay. *Held,* the testimony was improperly received.

3. SAME—*Solvency of Grocery Company and First Trustee Not Shown.* Eliminating the testimony improperly received, the findings of fact disclose insolvency of the grocery company, and the finding that the first trustee had assets from which he could have paid, or could have been compelled to pay, the sums due from the grocery company and from him, is not sustained.

4. SAME—*Good Faith of Trustee—Presumptions.* The law presumes good faith on the part of the trustee, and careful exercise of judgment and discretion in the performance of her duties, and before the debt of the grocery company may be charged to her account, ability to collect it from the grocery company or from her predecessor should be established.

5. SAME—*Erroneous Charge against Trustee.* The proceedings considered, and *held,* the trustee's account was wrongfully charged with the full amount of the grocery-company debt.

6. SAME—*Prior Trustee—Not Guilty of Breach of Trust.* In addition to the credit on the grocery-company books, portions of the trust estate consisted of shares of stock of the grocery company and shares of bank stock. The grocery company was indebted to the bank. The first trustee applied the bank stock on the bank debt, and took credit on the books of the grocery company. Under special circumstances stated in the opinion, it is *held,* the first trustee was not guilty of a breach of trust.

7. SAME—*Certain Moneys Chargeable to Account of Present Trustee.* By virtue of an approved transaction, the trustee as an individual became indebted to herself as trustee. Acting in good faith, she caused the liability to be assumed by the grocery company, according to a method of dealing supposed to be safe. The money was not paid. *Held,* the law regards the money as having been in her hands the moment the transaction was concluded, and the item, with simple interest, should be charged to her account.

8. SAME—*Competent Documentary Evidence.* Certain documentary evidence, introduced over objection of the trustee, was properly received.

9. SAME—*Findings of Fact.* Findings of fact considered, and held to be sufficiently complete, and to be sustained by competent evidence.

Appeal from Bourbon district court; EDWARD C. GATES, judge. Opinion filed January 10, 1920. Reversed.

*William P. Dillard,* and *Willard W. Padgett,* both of Fort Scott, for the appellant.

*J. I. Sheppard, James G. Sheppard,* both of Fort Scott, and *John B. Hart,* of Seattle, Wash., for the appellees.

The opinion of the court was delivered by

BURCH, J.: The origin and general nature of the action are described in the opinion in the case of *Hart v. Bank*, 105 Kan. 434, 185 Pac. 1, and need not be restated. The facts involved are very numerous, and with respect to some subjects, somewhat complicated. The legal questions deserving attention, however, are few, and the solving principles are well settled. Therefore, the court will burden the pages of the Kansas reports with as little of the controversy as possible, and will announce its conclusions with as little elaboration as possible.

Nellie D. Stadden, whose will created the trust, died on December 2, 1900. Leo I. Stadden, a son of the testatrix, qualified as trustee on December 10. Lillian M. Prager, a daughter of the testatrix, succeeded him on May 26, 1902, and will be referred to hereafter simply as the trustee. The will specified no property which should constitute the *corpus* of the trust estate. On December 29, 1900, the personal property belonging to the estate of the testatrix, including a large credit on the books of the grocery company, was partitioned by a contract which the trust beneficiaries have expressly ratified. By that contract Leo. I. Stadden, trustee, became vested with substantially one-third of the credit, in the sum of $10,072.12, the remainder being divided with approximate equality between Leo I. Stadden, personally, and Lillian M. Prager. Capital stock of the grocery company, belonging to the testatrix, was similarly divided. On May 26, 1902, the grocery company sold its stock of merchandise, went out of business, and proceeded to wind up its affairs. The trustee asked her predecessor, who was president and manager of the grocery company, and asked McLaughlin, who was, and long had been, bookkeeper of the grocery company, for statements of account. On June 3 McLaughlin furnished a statement of the debts of the grocery company to others than Lillian M. Prager as an individual and as trustee. The statement showed:

| | |
|---|---:|
| Bills and accounts payable | $13,553.65 |
| Due bank | 10,000.00 |
| Sundry accounts | 165.30 |
| Due Leo I. Stadden | 388.61 |
| A total of | $24,107.56 |

The statement did not purport to be complete. It recited that it did not include bills to the amount of about $2,000 due that month. It gave the bank balance on June 1 as $6,851.17. On June 4 a partition of real estate was made by a contract which included disposition of the real estate of the grocery company. By the partition the trustee received a farm, Leo I. Stadden received the Stadden home and some other tracts of small value, and Lillian M. Prager received the grocery-company store building and warehouse. Differences in value were adjusted by a satisfactory method. This contract was approved by the court, and was ratified by the beneficiaries by an election which precluded them from disputing its propriety or conclusiveness. On July 1 Leo I. Stadden and McLaughlin furnished the trustee statements of her account with the grocery company, and under date of June 30 McLaughlin furnished her a statement of the assets and liabilities of the grocery company, which reads as follows:

"FORT SCOTT, KAN , June 30, 1902.

"STATEMENT.

"Cash in bank...................... $3,046.89
Cash in bank (Cruce)............. 8.88
Bills receivable .................. 9,888.32
Ledger balance, store fixtures, worth, 1,527.41
Accounts receivable from all sources, 40,705.25
                                            $55,176.75

"Bills payable .................... $7,686.57
W. Prager ....................... 186.78
L. M. Prager..................... 7,424.73
L. M. Prager, Trustee............. 13,293.35
Odds and ends.................... 104.95
                                            $28,696.38

"Some entries made since June 1 have changed accounts receivable a trifle."

The increase in the indebtedness of the grocery company to the trustee from $10,072.12 in December, 1900, to $13,293.35 on June 30, 1902, resulted from the bank-stock transaction considered in *Hart v. Bank,* supra, the real-estate partition, and balancing of some minor debits and credits. With the statements referred to before her, the trustee allowed liquidation of the grocery company to proceed, without suit or other demand for payment of her claim. In October she received a partial payment. There is no finding that due diligence was not used in collecting the assets of the grocery

company, that more money could have been realized than was realized, or that any of the money derived from the grocery-company assets was misapplied or improvidently consumed. The trustee received 36 per cent of her claim.

The findings of fact approved the conduct of the trustee in her administration of the trust for nearly fourteen years, except in the single respect that she failed to collect of the grocery company and of her predecessor the full amount of the debt due from the grocery company, when she might have done so. The trustee moved to set aside the findings on which liability was predicated. The beneficiaries, entertaining a conception of the case radically different from that reflected by the findings, moved to set them aside. Both motions were denied. Judgment was rendered against the trustee for $15,-527.21, and she appeals. The beneficiaries file a cross appeal.

The findings of fact of which the trustee complains are the following:

"24. On December 29, 1900, the date of said [personal property] contract, the debt of $10,072.12 as specified in said contract as due from the I. Stadden Grocery Company to the said Leo I. Stadden as trustee for the respondents, was at said time worth said sum in cash, and that said sum of $10,072.12 could have been collected from the I. Stadden Grocery Company.

"25. That during the lifetime of the said Nellie D. Stadden and during all the time that the said Leo I. Stadden was trustee for these respondents, the said I. Stadden Grocery Company was solvent and able to pay all of its debts and obligations, including the said sum owing to the said Leo I. Stadden, as trustee.

"28. While the said Leo I. Stadden acted as trustee for the respondents, he neglected the interests of the respondents and of the trust estate, and made no effort whatever to collect in, preserve or invest the said trust estate for these respondents. That during the time the said Leo I. Stadden was trustee, no part or portion of said trust estate whatsoever was used for the benefit, the education, or maintenance of these respondents, nor did these respondents, during said time, receive any benefit of any nature whatsoever therefrom. That the said Leo I. Stadden failed to keep or preserve any books, records or papers showing the way in which said trust properties were handled. That it was his duty as such trustee so to do. Said Leo I. Stadden violated his duty as trustee, and his acts and conduct in the handling of the properties belonging to the trust estate, by reason of his carelessness and willful neglect, resulted in loss and damage to the respondents.

"31. On May 26, 1902, the I. Stadden Grocery Company's assets consisted of real estate of the value of $9,000, a stock of merchandise of the

Prager v. Hart.

value of $32,137.81, of cash in bank of $6,851.17, of accounts receivable of $40,705.25, of bills receivable $9,888.32, and of store fixtures estimated to be worth $1,527.41, making an aggregate of book assets of $100,109.96. On the same day, the said company was indebted to the Citizens National Bank in a sum of more than $27,000, to other note holders in the sum of $5,263.75, to merchandise and other creditors $20,972.24, to city creditors $165.30, to 'Leo I. Stadden $388.61, to Leo I. Stadden, Trustee, $13,293.35, to Lillian M. Prager $7,424.73, to W. Prager $186.78, and to odds and ends $104.95, aggregating a total indebtedness of more than $74,799.71; and at this time, Leo I. Stadden, Lillian M. Prager, and every other person interested in or connected with the I. Stadden Grocery Company, thought and believed that its assets were much more than sufficient to pay all of its debts and obligations, and this belief and opinion was a reasonable one under all the circumstances and the facts as known to them, and as shown by the books of the I. Stadden Grocery Company, and such belief and opinion was held and shared in by Lee B. Hart, the father and natural guardian of the respondents herein, who was more familiar with the affairs of the grocery company than any other person, with the exception of Leo I. Stadden, and who was present in Fort Scott several times during the year and five months from the death of Nellie D. Stadden to June 1, 1902.

"49. That during the years 1901 and 1902, the said Leo I. Stadden and the I. Stadden Grocery Company and each of them owned properties and assets from which they could have paid or could have been compelled to pay all sums due from either of them to the said trust estate; that the capital stock of the I. Stadden Grocery Company, held in trust for the respondents, on the 26th day of May, 1902, the date of the appointment of Lillian M. Prager as trustee, was practically worthless; that the said Lillian M. Prager, trustee, made no effort to collect from the said Leo I. Stadden and the I. Stadden Grocery Company, sums due from them or either of them to the trust estate, except that she or her husband received such sums as Leo I. Stadden paid to them; that had she made proper effort to do so, she could have collected the same; that in her failure to make proper effort to collect in and take possession of all moneys due and belonging to the trust estate, she violated her duties as a trustee and is guilty of neglect and carelessness, and has rendered herself liable and is liable for the failure to collect from the said I. Stadden Grocery Company and the said Leo I. Stadden, the former trustee, the amounts due from the said grocery company, as hereinafter set forth in finding No. 50, which should have been collected within a reasonable time after she became trustee; that such reasonable time would be to June 1, 1903."

When considering these findings, several others must be taken into account. Finding No. 32 reads as follows:

"On May 26, 1902, the I. Stadden Grocery Company sold its stock of merchandise to the Fort Scott Wholesale Grocery Company, for the sum of $32,137.81; and this money was promptly used by said grocery com-

pany in the payment of its indebtedness to the bank, its indebtedness to its other note holders, and its indebtedness to its merchandise creditors; and from the proceeds of said sale and such collections as were made between that time and June 30, 1902, the grocery company reduced its indebtedness to $28,696.38, consisting of the following items: Bills payable $7,686.57, W. Prager $186.78, L. M. Prager $7,424.73, L. M. Prager, Trustee, $13,293.35, and odds and ends $104.95.

"The books of the Citizens National Bank, showing the account of the I. Stadden Grocery Company with that bank from May 23, 1902, until the close of the account on October 6, 1903, were introduced in evidence; and those accounts show that on May 23, 1902, the grocery company had a balance on deposit of $2,176.42, and the subsequent deposits, including the $32,137.81 realized from the sale of the stock of merchandise of the company and the subsequent collections of the company upon its accounts and bills receivable; and said accounts also show the subsequent checks of the company against its deposits, during said time, for the payment of its debts and obligations.

"Until the sale of its business, as herein set forth, the I. Stadden Grocery Company appears to have kept a very full and complete set of books, showing the condition of its affairs and business, through A. J. McLaughlin, an experienced and capable bookkeeper; after the sale of the business of the company, these books passed into the possession of Leo I. Stadden, who was the president of the company at the time of the sale. These books were not only very numerous in number but were very bulky, and required considerable space in which to keep them. The said Leo I. Stadden retained possession of them until just before he removed to California to live, in the year 1907, at which time he destroyed them, except three leaves which purport to show the account of Lillian M. Prager as an individual, and Lillian M. Prager as trustee for the respondents, with the company, and these leaves were introduced in evidence; and while those leaves differ in some of the items from the statements furnished by McLaughlin and Stadden to Lillian M. Prager on July 1, 1902, the differences do not affect the determination of this controversy."

Finding 36 relates to the real-estate partition, and reads in part as follows:

"This contract was promptly recorded in the office of the register of deeds of Bourbon county, Kansas.

"Just before the making of this contract, Lee B. Hart, who was an attorney at law and the father of the Hart heirs, was in Fort Scott, Kan., and the contract was written at his request, and at the request of Leo I. Stadden, by W. W. Padgett, an attorney of Fort Scott; the valuations of the real estate, inserted in the contract, were fixed and agreed by the said Hart and the said Stadden, and as fixed and agreed, furnished to the said Padgett; Lillian M. Prager, while a party to the contract, in her individual right and as trustee, took no part in the valuations of the real estate, and relied upon the wishes and opinions of her said brother and

Prager v. Hart.

her said brother-in-law; it was the expressed wish and desire of the said Lee B. Hart that his children should receive and have the farm, and his wishes and desires in this particular were acquiesced in and acceded to by Leo I. Stadden and Lillian M. Prager; the said Hart left Fort Scott for the state of Washington shortly before the making of the contract, but he was, immediately after it was executed, furnished a copy by Leo I. Stadden, and that copy remained in his possession until his death, and was found among his papers after his death by his brother, John B. Hart, the uncle and one of the attorneys of respondents in this proceeding; the · said Lee B. Hart died in Arizona in the year 1908; he was in Fort Scott frequently from 1902 until his death, visiting his brother-in-law, Leo I. Stadden, and his sister-in-law, Lillian M. Prager; he was familiar with the manner in which the said farm was being rented and being handled by Lillian M. Prager, as trustee for his children, and during his lifetime he made neither demand nor complaint to said Lillian M. Prager that any different manner of handling the said farm should be adopted, or that the contract of division was not just and equitable;  . . ."

Finding 47 reads as follows:

"At the time of her appointment as trustee for respondents, Lillian M. Prager owned and held in her individual right, a debt against the I. Stadden Grocery Company of more than fifty per cent of the indebtedness of that company to her as trustee for respondents, and also more than $10,000 worth of stock of the I. Stadden Grocery Company that was turned over to her as trustee for respondents; in all her transactions with reference to the trust estate of respondents, she acted with the same care and prudence with which she acted in the management and conduct of her own interests in the I. Stadden Grocery Company; she adopted and pursued for the collection of her own claim and interest the same course of action which she adopted and pursued for the collection of the trust estate."

The trust estate consisted of some articles of personal property which were duly accounted for, and which may be omitted from further consideration; of bank stock accounted for as shown in the case of *Hart v. Bank*, supra; of an interest in real estate accounted for by the partition contract; of shares of grocery-company stock which came into the trustee's hands, but which were worthless when received; and of the claim against the grocery company, arising from the credit on its books. The trustee's liability for this claim is not for something which she received and for which, under well-recognized principles of trust administration, she must strictly account, but is for something which she never had. It was no fault of hers that her predecessor had not collected the debt from the grocery company before her appointment. She can be held

responsible for none but her own delinquency, and the measure of her duty was good faith and reasonable prudence and diligence. The court based its conclusion that the trustee should account for the full amount of the debt on solvency of the grocery company on the day of her appointment, and loss to the trust estate by reason of failure to collect the debt by June 1, 1903. The trustee asserts that the finding of solvency of the grocery company rests entirely on evidence improperly received.

A part of the evidence objected to is the account of the grocery company with the Citizens National Bank of Fort Scott for the month of May, 1902, and the account of the grocery company with the bank from May 23, 1902, to the close of the account on October 6, 1903. The account for the month of May appears to have been disregarded in making up the findings of fact. The other account discloses the information stated in finding 33, was the best evidence obtainable regarding liquidation of the grocery company, because of destruction of its books, and was quite informing. The objection made to it really reduces to lack of certification of the particular transcript of the bank books which was offered, an objection which the court regards as formal rather than substantial.

In a deposition given by Leo. I. Stadden on February 2, 1917, the following questions and answers appear:

"Q. When you resigned as trustee you were perfectly solvent, were you not? A. I was.

"Q. And you could have paid the value of the [bank] stock had you been compelled to pay it, could you not? A. I expect I could.

"Q. At the time when the contract, Exhibit 'A' (the personal-property division contract), was entered into December 29, 1900, was the I. Stadden Grocery Company solvent? A. Yes.

"Q. Could it have been forced to pay this sum of money if a suit had been brought and collection forced? A. Yes, I think so."

The trustee objected to consideration of the answers because the questions called for conclusions of the witness instead of for facts—that is, for some fair enumeration and valuation of assets and liabilities from which the court might determine the question of solvency or insolvency. The action was not directed against Leo I. Stadden, but against Lillian M. Prager, and his admissions, made long after the events under investigation occurred, could not bind her. The sub-

ject to which the testimony related was not simply the general standing or credit of the grocery company. The issue was not one permitting a mercantile condition to be indicated by abbreviating or summarizing word or phrase. The trustee was called on to account for the loss of real money, and she could not be made liable by judgment for a definite sum except on proof of facts from which ability to collect a definite sum from the grocery company might be asserted with reasonable assurance.

The presumption is that in its final decision the court disregarded testimony which it ought not to consider. The presumption may be indulged in this instance if proper evidence of solvency may be discovered; otherwise the finding of a material fact is vitiated.

If the court derived its inference of solvency from the statements of account included in the findings of fact, and from the bank account of the grocery company incorporated in the findings of fact by finding 32, it was mistaken. Finding 31 undertakes to state the financial condition of the grocery company on May 26, 1902, just before sale of its stock of merchandise for its value, $32,137.81. On May 26 the grocery company did not have cash in bank in the sum of $6,551.17. That sum was evidently taken by the court from McLaughlin's statement of the bank balance on June 1, which was not, in fact, the correct balance on June 1. No bank transaction is recorded for May 24 or May 25, and the balance carried over from May 23 to May 26 was $1,550.31. Besides the proceeds of the sale of merchandise, collections made between May 26 and June 1 were deposited, checks drawn on the account were paid, and the actual bank balance on June 1 was $8,553.52. The bills receivable and accounts receivable stated in finding 31 as assets on May 26, are the bills receivable and accounts receivable contained in McLaughlin's statement of June 30. From May 26 to July 1 more than $18,000 were collected from this source. The total assets on May 26 are called "book assets." No value whatever is assigned to the bills and accounts receivable, listed at more than $50,000, and consequently, finding 31 does not present the true financial condition of the grocery company on May 26, at all. Finding 31 includes among the assets of the grocery company on May

26, real estate of the value of $9,000. The trustee, as such, received the full benefit of this real estate by the partition contract made on June 4. Having once had the benefit of this item, the beneficiaries cannot use it again as a source from which the trustee might have derived funds wherewith to satisfy the grocery-company book account.

McLaughlin's statement of June 3 shows that if the cash in bank were applied to the payment of general debts of the grocery company—that is, debts other than those to Lillian M. Prager in her two capacities—there would remain unpaid but $17,256.39, plus bills for about $2,000 due in June. The deposits for June and July were $19,217.28. Substantially the entire bank account was appropriated to the payment of general debts before August 1, the bank balance on that day being $13.61; yet, in August and September more than $9,000 were paid out through the bank, on general obligations.

McLaughlin's statement of June 30, adopted by the court in finding 32, shows the total general debts of the grocery company remaining unpaid to be $7,978.30. The cash in bank was given as $3,046.89. The true balance was $3,081.84. If the cash stated were applied to the payment of the debts stated, the unpaid balance would be $4,931.41, due on June 30. The deposits for July were $5,837.70; yet, as indicated, in August and September general debts amounting to more than $9,000 were paid from the bank account.

Finding 32 states that the bank books show a balance of $2,176.42 in favor of the grocery company on May 23. The statement is not correct. Taking May 23, however, as a starting point, the bank books show a credit of $2,176.42 and a debit of $1,309.46, or a balance of $866.96. On May 26 the proceeds of the sale of merchandise were deposited, which, added to the balance, made a total on deposit of $33,004.77. This deposit was followed by others made in May, June, July, and August, amounting to $31,835.35. On September 1 the bank balance was $1,325.28, so that before September 1 there were paid, through the bank, on general debts of the grocery company, more than $63,500. After that, approximately $4,300 were paid on claims of the same character, making a total of $67,800. The court stated the total liabilities of the grocery company as $74,799.71. If to the debts actually paid

there be added the debt to the trustee, $13,293.35, plus the debt to Lillian M. Prager, as an individual, $7,424.73, or $20,-718.08 altogether, it is apparent the liabilities of the company must have exceeded $88,500.

From September 1 to the close of the bank account in October, 1903, the total deposits were approximately $8,500. The bank balance on September 1 was $1,325, making a total of $9,825. This amount would not satisfy the claim of the trustee alone by more than $3,400. Out of bank deposits the trustee received, in her two capacities, approximately $4,500. The proceeds of grocery-company assets which she received from all sources, she distributed, two-thirds to the trust estate and one-third to herself. She derived nothing at all from grocery-company liquidation until October, 1902.

The result of the foregoing is that McLaughlin's statements cannot be reconciled with the story told by the bank books. The assets of the grocery company were less, and the liabilities were greater, than the court found. The undisputed testimony of those who handled the grocery company's bills and accounts receivable was that large sums were uncollectible. The grocery company was insolvent when it sold out and went into voluntary liquidation, and the bulk of the collectible assets were reduced to cash and were paid out on general debts with great rapidity, and before the trustee received anything.

In meeting the challenge of the trustee, that there is no evidence, considered by the court, proving solvency, unless it be Leo I. Stadden's declaration, the beneficiaries say the McLaughlin statement of June 30 shows assets of more than $55,000 after all debts were paid. The McLaughlin statement did not place a valuation on the assets listed, and has been demonstrated to be unreliable. It is said that after the general debts of the grocery company were paid, it had in bank from $15,000 to $18,000. The computation ignores the portion of finding 32 relating to what the bank account shows, and the finding is abundantly supported by the testimony of Leo I. Stadden, and other evidence. It is said that on the death of the testatrix the grocery-company stock was appraised at $65 per share, and that in a certain transaction which has not been mentioned, the trustee and Leo I. Stadden dealt with the stock at a valuation of approximately $65 per share. The court

properly found the stock was worthless. It is said that neither the trustee nor her husband, William Prager, who was her agent, and who was secretary and treasurer of the grocery company, denied solvency of the grocery company. Their opinions would have been quite as inadmissible as the opinion of Leo I. Stadden. It is said that solvency is shown by some mercantile reports made by the grocery company. The court excluded those reports from the evidence. It is said that a huge volume of assets of the grocery company have been chased into the possession of the trustee, and the question is asked, Who got the money? The statement and question disclose the theory of the case propounded by the beneficiaries, which, for reasons already indicated, is unsound, in fact and in law. Finally, it is said that Stadden's statement was properly received in evidence. This court holds otherwise, and there is nothing else in the record sufficient to overcome the evidence of insolvency.

With the true condition of the grocery company determined, the conduct of the trustee is easily appraised. Everybody believed, and the court properly found the belief to be reasonable, under all the circumstances, that the grocery company was solvent. The trustee did not rest on that belief. She promptly applied to the proper persons for statements of account, with the result that it appeared the assets were liquid and sound, that on July 1 the outstanding general obligations amounted to less than $8,000, that there was more than $3,000 cash in the bank, and that there were other assets totaling more than $52,000. There is no dispute that realization on the grocery company's assets was well conducted. Collections were speedily being made, and there was no valid reason whatever for the trustee to interfere. The fact that in October, November, and December, 1902, she received only $2,550, was sufficient to put a reasonably prudent person on inquiry; but until the close of the year, or near the close of the year, nothing occurred to require the trustee to resort to adversary measures. By that time only the husks of the grocery company remained, to the amazement of everybody, excepting, probably, Leo I. Stadden, and Lee Hart, father of the beneficiaries. The only practicable method by which the trustee could then have reached the assets of the grocery company,

consisting of claims of divers kinds against numerous debtors scattered through several states, was by a receivership, which would not have netted her more money than she did in fact obtain. The testimony was that she received everything collected after close of the bank account.

The brief of the beneficiaries is filled with charges of deception, bad faith, dishonesty, fraud, conspiracy in the concoction of vicious schemes to deplete the trust estate, and other moral delinquencies on the part of the trustee. Many of the contentions of the beneficiaries in their cross appeal depend on the truth of these charges. To debate the subject in all its aspects and applications would require a volume, and the court contents itself with saying, once for all, that the findings of honesty, good faith, and innocence of intentional wrongdoing, are all approved. The prudence and reasonableness of the conduct of the trustee are to be judged by the facts as they existed in 1902, not as they appeared fifteen years later; and from the findings of fact, modified by eliminating solvency of the grocery company, the court concludes the trustee is not chargeable with the grocery-company debt on the ground of breach of duty in not enforcing payment by the grocery company.

In stating the account of the trustee with the grocery company, the court made use of the ledger leaves singularly preserved by Leo I. Stadden, referred to in finding 32. The trustee asserts they were improperly received in evidence. That the trustee had an account with the grocery company is, of course, not in dispute. Indeed, that account disclosed a large portion of the assets of the trust estate, and the trustee herself depended upon it with respect to both debits and credits. The first thing she did after appointment was to ask for statements of that account, which she received. Leo I. Stadden testified that she was regularly furnished statements of the account, and she admitted receiving statements other than those specifically requested. Identity of the ledger leaves was established by the testimony of Leo I. Stadden, and William Prager gave it as his best judgment that the sheets were leaves from the ledger of the grocery company. The entries were in the handwriting of McLaughlin, the bookkeeper, up to the time he left the company. After that the entries were

in the handwriting of Leo I. Stadden, who had possession of the books and kept the accounts. Under these circumstances, the evidence was properly received.

The court found the grocery-company debt could have been collected from Leo I. Stadden, and that the trustee was at fault for not doing so. The debt of the grocery company was not an asset of the trust estate by virtue of any act or conduct of the trustee. She was not accountable for any depreciation in value suffered before it came to her, and she accounted for it as it came to her. Her breach of duty, if any, consisted in not realizing the debt by judgment and execution against Leo I. Stadden. There is no law declaring that an incoming trustee must always sue his predecessor. The duty to sue comes into existence, or does not come into existence, according to circumstances, very often circumstances of considerable variety and complexity. One circumstance is whether or not anything may be gained by suit. Lillian M. Prager was trustee of the estate in controversy, not the district court, or this court, or anybody who might clamor about her conduct. One of her functions as trustee was to determine whether or not she ought to sue her predecessor. There is no law which declares an exercise of the judgment and discretion vested in a trustee to be *prima facie* a breach of duty. The legal presumption is the other way, and before the debt of the grocery company can be charged to the trustee, diminution in value before it came to her, and ability to recoup the loss to the trust estate from Leo I. Stadden personally, must be established.

The finding that Leo I. Stadden had assets from which he could have paid, or could have been compelled to pay, all sums due the trustee from the grocery company and from him, rests largely on his admission of solvency. He had received some personal property from his father's estate in 1888, but what he had done with it is not disclosed. His bank account from September 6, 1902, to the close of the account by taking up an overdraft on July 26, 1903, was introduced in evidence, over objection of the trustee. The court is of the opinion the account was admissible for what it was worth, but it had practically no probative value because there was no explanation of either debits or credits. The account begins after he had

collected the balance due him from the grocery company, shown on the McLaughlin statement of June 3, and begins with a balance of $3.70. The only real estate of consequence which he derived from the partition of June 4 was his homestead. The remainder was designated as odds and ends. He turned over his bank stock to the bank on the grocery company's indebtedness. His grocery company stock was worthless. During the five years he remained in Kansas he possessed common articles of personal property, and owned some horses, one a driving horse; but what his assets and liabilities were at any time was not established, and the finding that more than $13,000 could have been collected from him between May 26, 1902, and June 1, 1903, is not sustained without taking into consideration his admission of solvency.

The reason for excluding evidence of that kind in cases of this character becomes apparent when the particular testimony is scrutinized. The witness said he was perfectly solvent. When asked if he could have been compelled to pay the value of the bank stock, which was $2,000, he became less positive, and returned a qualified answer. There can be no doubt whatever that he did not regard the entire book account of the grocery company as an additional charge upon his assets, and likewise collectible from him. Therefore, in such a situation, the law does not dally with random opinions and conclusions, but demands production of facts.

The result of the foregoing is that finding 49 and dependent findings 50 and 51 must be modified.

Finding 21, relating to the bank-stock transaction described in *Hart v. Bank*, supra, requires notice because, if a breach of trust occurred, the bank might have been held responsible. The finding is approved, because the transaction did not constitute the common case of a loan or investment of trust funds on unauthorized security. The grocery company was the golden horn of plenty out of which the trust estate came. A part of the estate consisted of a credit standing in the name of the testatrix on the grocery company's books. A part of the estate consisted of 190 shares of stock of the grocery company, to which, under the existing statute, double liability attached. The will gave the trustee express authority to hold the stock. Its value was lessened in proportion to liability for the bank

debt, and would be increased by payment of the bank debt. The grocery company was supposed to be as sound as the bank. The transaction was conducted in entire good faith, the trustee using $2,000 of his own bank stock in the same way at the same time. The trustee exercised his best judgment in what at the time appeared to be a reasonable and prudent way, and while a trustee differently situated might not be allowed to use funds differently related in similar manner, the court holds it cannot be declared, as a matter of law, that the trustee was guilty of a breach of trust. In the opinion in *Hart v. Bank,* supra, the transaction was treated as a breach of trust, solely for purposes of a decision applying the statute of limitations.

Finding 39, relating to adjustment of differences in value of real estate partitioned, reads as follows:

"In the contract of June 4, 1902, in and by which the real estate was partitioned among the interests involved, the sum of $890.58 was declared to be due from Lillian M. Prager as an individual, to Lillian M. Prager as trustee for the Hart heirs, by reason of the difference in the value of the real estate agreed upon which was partitioned to Lillian M. Prager as an individual and to her as trustee for the said Harts; this sum was not paid by Lillian M. Prager to herself as trustee in money, but the matter was handled in the same way that other transactions were handled, and which have been hereinbefore set forth. There was also a sum to be paid by Lillian M. Prager to Leo I. Stadden, growing out of the difference in value of the real estate awarded to them. In both instances, these differences were settled by having the account due from the I. Stadden Grocery Company to Lillian M. Prager as an individual, charged with the respective amounts and the accounts due Leo I. Stadden and Lillian M. Prager as trustee, credited with the respective amounts. I find that at the time of this transaction both Leo I. Stadden and Lillian M. Prager, as well as every one connected with or interested in the I. Stadden Grocery Company, was of opinion and believed that there was not the slightest question about the ability of the I. Stadden Grocery Company to pay in full all its debts and obligations, and that Lee B. Hart, the father of the Hart heirs, not only shared this belief and opinion, but was fully cognizant of the entire transaction from the beginning, and during his lifetime made no objection to nor complaint of it, or to the manner in which the difference was adjusted, and that in what she did, Lillian M. Prager intended no fraud, wrong or injury to the trust estate, and was actuated by an honest purpose toward her nephew and nieces, and had no thought of benefit or advantage to herself."

The court approves the finding as stating the facts, but the facts are not sufficient to excuse the trustee from liability.

The law regards the money due from Lillian M. Prager to herself as trustee as being in her possession the moment the contract became effective. Being in her possession, she is required to account for it, and it is not enough for her to say that she satisfied her obligation by procuring the grocery company to. undertake payment. The grocery company was no longer a going concern, as it was at the time of the bank-stock transaction. It had gone out of business, was engaged in paying its debts, instead of contracting new ones, derived no benefit from the attempted increase in its liabilities, and in the end did not pay; consequently, the trustee should be charged with 64 per cent of the item, with simple interest from June 4, 1902.

Many other subjects are dealt with in the briefs. There is no substantial disagreement between counsel for the respective parties regarding the rules of law governing the case, except in respect to matters already discussed. They are very far apart in their interpretations of the evidence. The court has carefully considered the findings of fact in the light of the evidence abstracted and in the light of some of the original evidence, and has carefully considered all the elaborate arguments of counsel. The conclusion is that the findings are sufficiently complete; every material finding, except as noted, is sustained by sufficient competent evidence; and the findings so sustained are approved. Because solution of the controversy depends on what the facts are, it would not be profitable to extend this opinion further.

Lee Hart, father of the beneficiaries, was himself a lawyer. As the court found, and the finding is well sustained, he was probably more familiar with the affairs of the grocery company than any other person except Leo I. Stadden. During the five or six years he lived after the events of May and June, 1902, he made no complaint of the conduct of the trustee, who accepted appointment at his solicitation. Fourteen years after the bubble of the grocery company burst, it fell to an uncle of the beneficiaries, also a lawyer, to commence and conduct vicarious litigation. When the beneficiaries became arrayed against their aunt and trustee, their father was dead. McLaughlin was dead. Leo I. Stadden had long been a resident of California. The books of the grocery company had been

destroyed. Apparently, all discoverable documentary evidence has been produced, and all other evidence which the parties desired to introduce has been canvassed at a very full and fair trial. Under these circumstances, the controversy ought to end.

The judgment of the district court is reversed, and the cause is remanded with direction to enter judgment in accordance with the views which have been expressed.