MUTUAL FEDERAL SAVINGS & LOAN ASSOCIATION, Appellant v. WISCONSIN WIRE WORKS and others, Respondents.

*No. 36. Argued February 26, 1973.—Decided April 9, 1973.*
(Also reported in 205 N. W. 2d 762.)

For the appellant there was a brief by *Frisch, Dudek, Slattery & Denny*, attorneys, and *Edward A. Dudek* and *Jerry H. Friedland* of counsel, all of Milwaukee, and oral argument by *Edward A. Dudek*.

For respondent Eugene B. Brownell the cause was submitted on the brief of *Fulton, Menn & Nehs, Ltd.*, of Appleton.

For respondent Megal Development Corporation there was a brief by *Adolph I. Mandelker*, attorney, and *David M. Kaiser* of counsel, both of Milwaukee, and oral argument by *Mr. Kaiser*.

HEFFERNAN, J. We see no ambiguity in the terms of the contract. The entire balance due on the mortgage note is to become due and payable at the option of the mortgagee if the mortgagor:

". . . shall convey away said mortgaged premises or if the title thereto shall become vested in any other person or persons in any manner whatsoever, unless the consent . . . is first obtained."

In Wisconsin, a state which follows the lien theory of mortgages, the mortgagee does not have legal title. The full ownership, both equitable and legal, is in the mortgagor, and the interest of the mortgagee is that of a lien holder. The mortgagee is merely the holder of a security interest. Osborne, *Mortgages* (hornbook series), p. 208, sec. 127. Under the facts of this case, Wisconsin Wire Works, despite the prior mortgage of Mutual, held the full interest in the land, including the right of possession, subject however to the security interest of Mutual. When Wisconsin Wire Works entered into a land contract, the vendee Megal, by the process of equitable conversion, became the owner of the land in equity, while Wisconsin Wire Works retained the legal title to secure the balance due on the purchase price. *Kallenbach v. Lake Publications, Inc.* (1966), 30 Wis. 2d 647, 142 N. W. 2d 212. The equitable title acquired by Megal remained subject not only to the vendor's legal title but also to the lien of Mutual's mortgage. By the contract in question, Megal or its assignees became entitled to physical possession and occupancy of the premises.

We see no ambiguity in the phrase, "conveying away." Language of a contract is to be considered as a whole. When so considered, the words or phrases therein that are reasonably or fairly susceptible to more than one construction are ambiguous. *Lemke v. Larsen Co.* (1967), 35 Wis. 2d 427, 432, 151 N. W. 2d 17.

" '[L]anguage of a contract is to be accorded its popular and usual significance.' " *Schluckebier v. Arlington Mutual Fire Ins. Co.* (1959), 8 Wis. 2d 480, 483, 99 N. W. 2d 705. In *North Gate Corp. v. National Food Stores* (1966), 30 Wis. 2d 317, 321, 140 N. W. 2d 744, this

court accepted with approval the rule appearing in 17 Am. Jur. 2d, *Contracts,* p. 643, sec. 251, that:

" '. . . technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless the context of the contract or an applicable custom or usage clearly indicates that a different meaning was intended.' "

Black's, *Law Dictionary* (rev. 4th ed.), page 402, defines "conveyance" as follows:

". . . In real property law. In the strict legal sense, a transfer of legal title to land. In the popular sense, and as generally used by lawyers, it denotes any transfer of title, legal or equitable . . . . The transfer of the title of land from one person or class of persons to another. . . . An instrument in writing under seal (anciently termed an 'assurance,') by which some estate or interest in lands is transferred from one person to another; such as a deed, mortgage, etc. . . ."

One definition of "convey" appears in Webster's, *Third International Dictionary* (1965): "To transfer or deliver (as property) to another; *specif:* to transfer (as real estate) or pass (a title, as to real estate) by a sealed writing." The term "convey" applies to any transfer of title to the mortgaged property whether legal or equitable. By the execution of a land contract which conferred equitable title on Megal, Wisconsin Wire Works conveyed away the mortgaged premises. The contractual term is not ambiguous. In the parlance of both laymen and lawyers, a land contract is a conveyance.

In view of common and technical usage of the term "convey" and the purpose of the "due on sale clause" of the mortgage and note, there is no ambiguity. The land contract was a conveyance that gave the purchaser an equitable title to the property as well as the immediate right to possession.

The trial judge, having found the contractual terms ambiguous, dismissed the complaint without the necessity

of determining whether an acceleration clause of this type is valid. It is argued, however, by the appellants that the clause is not contrary to the public interest. We agree.

In *Grootemaat v. Bertrand* (1927), 192 Wis. 519, 213 N. W. 294, the court enforced an acceleration clause that provided the entire mortgage debt would be due and payable upon a default. In sustaining such clause, the court discussed acceleration clauses generally. It stated at page 521:

". . . it may be said that such provisions are neither penalties nor forfeitures. They are merely conditions of the contract entered into by the parties. They result only in an acceleration of the time of payment. The duties and obligations of the mortgagors remain the same. They must pay that which the mortgage was given to secure. But by reason of the terms of their own contract the time of payment is hastened."

Accordingly, it appears well settled that explicit contractual obligations may accelerate the obligation to pay the debt in full and are not contrary to public policy. Whether they may be utilized in a particular case is dependent upon the facts and whether the invocation of the acceleration clause would be inequitable under the circumstances.

The New York courts sanction the use of "due on sale" acceleration clauses, but the mortgagee's option to accelerate the mortgage debt will be enforced only if it does so in good conscience and fairness to the mortgagor. *Blomgren v. Tinton* (1962), 33 Misc. 2d 1057, 225 N. Y. Supp. 2d 347.

In *Loughery v. Catalano* (1921), 117 Misc. Rep. 393, 397, 191 N. Y. Supp. 436, 439, the New York court stated:

"It is a familiar principle of equity jurisprudence that a party having a legal right shall not be permitted to

avail himself of it for the purposes of injustice or oppression."

The Florida Court of Appeals has held that a mortgage foreclosure is an equity matter and that a mortgagee has a right to accelerate on the default of the mortgage conditions only if they are necessarily related to the preservation of the security. A Florida court will refuse to enter a foreclosure judgment when the acceleration of the due date would be unconscionable and its result would be inequitable and unjust. *Clark v. Lachenmeier* (Fla. App. 1970), 237 So. 2d 583, 584.

The California Supreme Court views acceleration clauses of this type as a device to restrain partially the mortgagor's right of alienation of the property. Mr. Justice TRAYNOR, speaking for the California court, upheld this type of clause as a reasonable restraint on alienation, because it was designed to protect a justifiable security interest of the mortgagee. After discussing a number of types of restraints on alienation which the common law had found reasonable, Mr. Justice TRAYNOR stated:

"In the present case it was not unreasonable for plaintiff to condition its continued extension of credit to the Enrights on their retaining their interest in the property that stood as security for the debt. Accordingly, plaintiff validly provided that it might accelerate the due date if the Enrights encumbered or transferred the property." *Coast Bank v. Minderhout* (1964), 61 Cal. 2d 311, 317, 38 Cal. Rptr. 505, 392 Pac. 2d 265.

The Wisconsin Constitution, art. I, sec. 14, provides:

"**Feudal tenures; leases; alienation.** SECTION 14. All lands within the state are declared to be allodial, and feudal tenures are prohibited. Leases and grants of agricultural land for a longer term than fifteen years in which rent or service of any kind shall be reserved, and all fines and like restraints upon alienation reserved in any grant of land, hereafter made, are declared to be void."

We conclude, however, that it does not affect the type of transaction under consideration.[1]

*La Sala v. American Savings & Loan Asso.* (1971), 5 Cal. 3d 864, 878, 97 Cal. Rptr. 849, 489 Pac. 2d 1113, reviewed the holding and rationale of *Coast Bank v. Minderhout* and discussed its application in respect to a "due-on-encumbrance clause." The case explains the ra-

---

[1] It appears that sec. 14 of art. I was added to the Wisconsin Constitution for the purpose of establishing that ancient principles of feudal property law are inapplicable within this state. In *Barker v. Dayton* (1871), 28 Wis. 367, the court was called upon to define the term "allodial," which appears in the provision. With respect to that term, the court said, at pages 384, 385:

"Taken in such connection, it means little more than if the framers had said 'free,' or 'held in free and absolute ownership,' as contradistinguished from feudal tenures, which are prohibited in the same sentence, and by the very next words, and the prohibition of which, with their servitudes and reservations, and all the attendant hindrances and obstacles in the way of free and ready sale and transfer of real property, constituted the chief object of the provision."

Our concern herein is with the constitution's use of the term "restraints upon alienation." The context of the term's use explains its meaning: "[A]ll fines and like restraints upon alienation . . . are declared to be void." In 1 Thompson, *Real Property* (1964 ed.), p. 153, sec. 34, "fine," when used with respect to feudal tenures, is discussed:

"The word 'fine' was used to denote a sum of money agreed to be paid by or exacted from the tenant on alienation of the feud, and was not a penalty imposed by a court. It was a sum exacted for a license to sell part of the tenant's holding. . . . By Magna Charta and the Statute of Quia Emptores all tenants except those in capite were relieved of this burden of a fine for alienation."

Blackstone observed that the fine:

". . . depended on the nature of the feudal connection; it not being reasonable or allowed . . . that a feudatory should transfer his lord's gift to another, and substitute a new tenant to do the service in his own stead, without the consent of the lord . . . ." Blackstone, *Commentaries on the Laws of England* (Chase 2d ed., 1884), p. 264.

It would thus appear that the restraints upon alienation discussed in the constitution are those employed under feudal property law to enforce the obligations of the tenant to his lord.

tionale of *Coast Bank* and California Court of Appeals cases that followed it. The California Supreme Court stated, at pages 879, 880:

> "*Coast Bank,* as we have seen, spoke of the borrowers 'retaining their interest in the property that stood as security for the debt.' (61 Cal. 2d at p. 317.) *Hellbaum,* in similar language, noted the creditor's interest 'in maintaining the direct responsibility of the parties on whose credit the loan was made.' (274 Cal. App. 2d 456, 458), *Cherry v. Home Sav. & Loan Assn.* discusses this reasoning in greater detail: 'Lenders run the risk that security may depreciate in value, or be totally destroyed. This risk of loss is reduced in the lender's viewpoint if the borrower is known to be conscientious, experienced and able. . . . If a borrower were able to sell the security without concern for the debt, he may take the proceeds of the sale, leaving for parts unknown, and the new owner of the property might permit it to run down and depreciate.' (276 Cal. App. 2d at pp. 578–579.)
>
> "The reasoning of these cases, while justifying enforcement of due-on-sale provisions clearly does not apply with equal force to restraints against future encumbrances. A sale of the property usually divests the vendor of any interest in that property, and involves the transfer of possession, with responsibility for maintenance and upkeep, to the vendee."

*La Sala* held that giving of a junior encumbrance by a mortgagor would not ordinarily pose the same dangers to a lender's security interests but emphasized, at page 881:

> "[I]nstances may occur when the institution of a second lien does endanger the security of the first lien. In some cases the giving of a possessory security interest . . . would pose the same dangers of waste and depreciation as would an outright sale."

Throughout the California cases, emphasis is placed upon the hazards that may well accrue to the lender if possession is transferred to a subsequent purchaser who is a stranger to the original security transaction. *Cherry*

*v. Home Savings & Loan Asso.* (1969), 276 Cal. App. 2d 574, 81 Cal. Rptr. 135, which was cited with approval by the California Supreme Court, is a court of appeals case which upheld the due-on-sale provision. *Cherry* emphasized, at page 579, that:

". . . [T]he lender places some value on his belief that the person who takes out the loan is reliable and responsible. A lender may, indeed, be willing to loan money to some persons or entities at one rate of interest but to other, less desirable risks only at an increased interest rate."

*Cherry* also points out that a due-on-sale clause is reasonably employed to protect against the contingencies of an increased interest rate:

"[A] due-on-sale clause is employed permitting acceleration of the due date by the lender so that he may take advantage of rising interest rates in the event his borrower transfers the security. This is merely one example of ways taken to minimize risks by sensible lenders.

"There is no inequity visible from such a provision." (P. 579.)

It is difficult to see, given the general policy behind a "due-on-sale clause," why a transfer of land title by a land contract does not pose the same potential hazard to the interests of the mortgagee as most other recognized types of conveyances.

We, accordingly, hold that a due-on-sale clause or in this case, to use the terms of the mortgage note, "due . . . if . . . convey[ed] away . . . or if the title thereto shall become vested in any other," is not against public policy and is enforceable as a contractual condition of the note and mortgage.

Nevertheless, as this court has frequently stated:

"An action to foreclose a mortgage is equitable in nature, *Frick v. Howard* (1964), 23 Wis. 2d 86, 126 N. W. 2d 619, and the defense of laches may be raised against

the mortgagee, *Bur v. Bong* (1915), 159 Wis. 498, 150 N. W. 431; *Saric v. Brlos* (1945), 247 Wis. 400, 19 N. W. 2d 903. The elements of laches are a cause of action against the defendant, and unreasonable delay and prejudice to the defendant resulting from the delay. *McDonald v. McDonald* (1972), 53 Wis. 2d 371, 192 N. W. 2d 903." *Wisconsin Brick and Block Corp. v. Vogel* (1972), 54 Wis. 2d 321, 327, 195 N. W. 2d 664.

*See also:* Footnote 3 in *Wisconsin Brick, supra,* page 327, which quoted with approval a statement from Corpus Juris Secundum in respect to a mortgagee's delay in enforcing his contractual rights. The elements of laches are arguably present in this case since the record indicates that the land contract was executed on April 26, 1967, and it was not until more than two and one-half years later, November 25, 1969, that Mutual declared the balance due. The trial judge, having found the contract ambiguous, had no occasion to determine whether or not the mortgagee's delay was explainable or whether it had any effect upon its right to assert the acceleration clause. The problem was, however, alluded to. The trial judge's memorandum decision stated:

"This compliant attitude of the association prevailed until its decision to declare the note due and the mortgage foreclosable, about two and a half years later. This position on the part of the association has some inferential significance on the imperativeness of the restriction as it was understood by the association from the terms of the contract."

While the record reveals that Mutual would have given its consent to the conveyance of the property directly to Kurz & Root, provided that the interest rate was increased and a transfer fee was imposed, the record is barren of any evidence that Mutual had any knowledge whatsoever of the transfer to Megal until at or about the time it declared the mortgage note due and payable. While it may well be that it had such information and a "compliant attitude" in view of that knowledge might

prejudice its rights in insisting upon strict enforcement, the record before us contains no evidence to show Mutual's knowledge of this particular transaction.

The respondent argues that, since the land contract was recorded on August 11, 1967, Mutual had constructive notice, since recording is notice "to the world." Respondent's statement incorrectly interprets the effect of the recording statute and the effect of recording a document. The essence of respondent's argument is that Mutual, a prior encumbrancer with a recorded security interest, could be affected by the recording of a document that vests some rights in a subsequent purchaser. The recording act, however, merely gives notice "to the world" that any subsquent purchaser takes subject to the rights granted by prior recorded instruments. While the prior recorded mortgage of Mutual was notice to Megal that it took subordinate to that prior mortgage, the mere recording of the subsequent land contract could in no way affect the rights of Mutual, the prior mortgagee. We thus cannot hold as a matter of law that, by virtue of the recording statute, Mutual slept on its rights for two and one-half years. This is a factual matter that must be resolved by the trial court. No express finding in regard to the knowledge that Mutual had of the land contract conveyance was made by the trial judge.

We thus are obliged to remand the record for further proceedings in order that the trial court may determine whether, in accordance with the equitable standards that are imperative upon the foreclosure of a mortgage, foreclosure will be permitted in this action.

We find nothing unreasonable in respect to the clause that accelerates the payment of the entire balance upon a conveyance without the consent of the mortgagee. Whether, under the circumstances, the invocation of the condition is in accord with equitable principles must abide further factual determinations and decision by the trial judge.

*By the Court.*—Judgment reversed and cause remanded for further proceedings not inconsistent with this opinion.

BEILFUSS, J., took no part.