No. 56,172

CAPITOL FEDERAL SAVINGS AND LOAN ASSOCIATION, INC., *Appellee*, v. GLENWOOD MANOR, INC., and LEDERMAN ENTERPRISES, INC., *Appellants*.

(686 P.2d 853)

Opinion filed July 13, 1984.

*Paul E. Vardeman,* of Polsinelli, White & Vardeman, P.C., of Kansas City, Missouri, and *David K. Fromme,* of Weeks, Thomas & Lysaught, Chartered, of Kansas City were on the brief for appellants.

*John Anderson, III,* of Anderson, Lastelic & Buchmann, of Overland Park, argued the cause, and *Brian C. McCormally,* of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: This is a mortgage foreclosure action. The trial court held plaintiff mortgagee, Capitol Federal Savings & Loan Association, Inc., was entitled to have its mortgage foreclosed and the subject property (commonly referred to as Glenwood Manor) sold with the proceeds therefrom applied to the debt, taxes and legal assessments. Defendants Glenwood Manor, Inc., and Lederman Enterprises, Inc., are the owners of certain interests in the mortgaged property and appeal from the judgment of the trial court. Inasmuch as one of the issues in the case concerns the exact legal status of the defendants' interests in the subject

property, we refrain from specifying the nature of their interests at this point in the opinion.

The facts giving rise to this action are not in serious dispute. The controversy primarily concerns the applicable law and legal conclusions to be drawn from the facts. The trial court's factual statement of the case adequately sets the framework for the legal issues and will be set forth herein. It should be noted that, at the time of the trial court's memorandum opinion, there were a number of other defendants who are not parties to this appeal. For appellate purposes, Glenwood Manor, Inc., and Lederman Enterprises, Inc., are the only defendants herein. With this prefatory clarification, the trial court's factual statement is as follows:

"In northeast Johnson County on the west side of Metcalf Avenue north of 95th Street is an expanse of land containing what for years was known as the Glenwood Manor, a motor hotel, the Glenwood Theater, and some smaller facilities. Suffice it to say that the land occupied by these businesses is prime commercial property.

"On April 27, 1973, defendant Glenwood Manor, Inc. executed and delivered to plaintiff a first mortgage note in the total amount of $3,125,000 at 8 ½% interest to be repaid in installments as provided therein and secured by a real estate mortgage duly made, executed and delivered on an even date therewith.

"The plaintiff is a federally chartered savings and loan association. Its principal place of business and correct post office address is located in Topeka, Kansas.

"At the time of the giving of the mortgage and as part of the same transaction, the defendants, Glen W. Dickinson, Jr. and Georgia Faye Dickinson, as partial consideration for the making of said loan by the plaintiff, gave to the plaintiff their joint and several personal guarantee for the repayment of said loan and all other terms of the said note. Mr. Dickinson is now deceased and his representative is not substituted in this action.

"On December 23, 1980, Glenwood Manor, Inc. entered into what was denominated a 'purchase agreement' with defendant Glenwood Hotel Partnership for the sale of the property which is the subject of this lawsuit which will be identified for the sake of clarity as the Glenwood Manor. The theater and other portions of the real estate were not included in the sale. The agreement was with a group entitled 'Glenwood Hotel Partnership' which is a defendant to this action. On or about February 23, 1981, pursuant to the terms and conditions of the 'Purchase Agreement' of December 23, 1980, defendant Glenwood Manor, Inc. received partial payment and consideration for the interest in the property in the amount of $2,500,000.

"On the 24th day of December, 1981, defendant Lederman Enterprises, Inc. purchased all interest of the defendant, Glenwood Hotel Partnership, in and to the property and did cause to be filed with the Register of Deeds of Johnson County, Kansas, an affidavit of equitable interest in and to the real property.

"A portion of the mortgage involved reads as follows:

" 'The loan evidenced by said note and secured by this mortgage has been made by said Lender by reason of the personal and financial responsibility of the

Borrower. The real estate mortgaged to secure said note may be sold, conveyed or otherwise alienated by the Borrower at any time subject to the lien of this mortgage, provided, however, that in such event, the Borrower agrees that said Lender may, at its option and for any reason it deems sufficient, elect to declare all remaining principal and accrued interest remaining due on said note immediately due and payable and foreclose this mortgage.'

"The plaintiff is contending that since February 23, 1981, due to the actions of Glenwood Manor, Inc. and the Glenwood Hotel Partnership that the mortgage and note have been in default by reason of '. . . sales, conveyances or alienations of the real property, . . .'

"The plaintiff contends it is entitled to interest from and after that date at the rate of 10% per annum as is set forth in the note and mortgage. The plaintiff contends that after just credit and application of all payments received, the unpaid principal balance on said note and mortgage is approximately $2,298,570.06.

"The transfer of interest between Glenwood Hotel Partnership and Lederman Enterprises, Inc. was accomplished through the defendant, Meadow Hills West Associates Ltd., which acted as a 'pass through' entity for purposes of attempting to effectuate a tax free exchange of the property for Lederman Enterprises, Inc. There was some evidence to the effect that the Internal Revenue Service of the United States was not recognizing that as a valid tax free exchange for tax purposes.

"At the time of the exchange between Glenwood Manor, Inc. and the Glenwood Hotel Partnership on February 23, 1981, the partnership paid to Glenwood Manor, Inc. over $1,000,000 in cash, delivered a promissory note in the amount of 1.5 million dollars, agreed to pay an additional sum of 1.3 million dollars on June 10, 1988, and agreed to pay the monthly mortgage payments evidenced by the note and mortgage held by plaintiff. In exchange for this consideration, the partnership obtained immediate possession of the hotel, acquired the sole right to manage and operate the business; acquired the right to receive all rents from business operations, obtained ownership of all equipment, fixtures, and furnishings located on the hotel premises, and acquired all outstanding contracts and leasing arrangements Glenwood Manor, Inc. had prior to the transaction.

"Between the time that there was a transfer of interest from the Glenwood Partnership to Lederman Enterprises, Inc., the Partnership made substantial improvements and repairs on the hotel in an amount of approximately $650,000.

"Since the transfer between Glenwood Hotel Partnership and Lederman Enterprises, the improvements have continued to the property. From the evidence it appears that the loan is well secured, and that the property, even if bulldozed, would be worth more than the outstanding debt balance.

"There was testimony received that at the time the Glenwood Hotel Partnership took over, there was an article in the Kansas City Star indicating that Mr. Ross had signed an operating agreement to manage the hotel as Catering Manager, General Manager and Executive Vice President.

"There was nothing in the article to suggest a change in ownership and Kent Dickinson, the former President of Glenwood Manor, Inc., was identified as the President in the article."

The trial court then concluded plaintiff was entitled to the

relief sought—foreclosure of its mortgage and sale of the property. Defendants Glenwood Manor, Inc., and Lederman Enterprises, Inc., appeal from this judgment asserting various claims of error.

For their first issue defendants contend the trial court erred in not barring plaintiff's claim on the defense of laches.

The doctrine of laches is based upon the maxim that equity aids the vigilant and not those who slumber on their rights. It is defined as neglect to assert a right or claim which, taken together with the lapse of time and other circumstances causing prejudice to the adverse party, operates as a bar in a court of equity. Alternatively, laches has been described as the neglect for an unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done. Laches is the neglect or omission to assert a right as, taken in conjunction with lapse of time and other circumstances, causes prejudice to an adverse party. Black's Law Dictionary, 787 (5th ed. 1979). In *Calkin v. Hudson*, 156 Kan. 308, 133 P.2d 177 (1943), this court observed laches existed when there was undue delay in the assertion of a legal right before a tribunal competent to enforce it. The *Calkin* court further commented mere lapse of time alone does not constitute laches but if such a delay has misled other parties to their prejudice, the bar of laches may be invoked. 156 Kan. at 318. More recently the Court of Appeals in *Moore v. Phillips*, 6 Kan. App. 2d 94, 627 P.2d 831, *rev. denied* 230 Kan. 818 (1981), in contrasting laches from estoppel stated:

"The doctrine of laches and estoppel are closely related, especially where there is complaint of delay which has placed another at a disadvantage. Laches is sometimes spoken of as a species of estoppel. Laches is a wholly negative thing, the result of a failure to act; estoppel on the other hand may involve an affirmative act on the part of some party of the lawsuit. The mere passage of time is not enough to invoke the doctrine of laches. Each case must be governed by its own facts, and what might be considered a lapse of sufficient time to defeat an action in one case might be insufficient in another. Laches, in legal significance, is not mere delay, but delay that works a disadvantage to another. *Clark v. Chipman*, 212 Kan. 259, 510 P.2d 1257 (1973). The defense of laches may be applied in actions at law as well as in equitable proceedings. *McDaniel v. Messerschmidt*, 191 Kan. 461, 464, 382 P.2d 304 (1963). In *Osincup v. Henthorn*, 89 Kan. 58, 130 Pac. 652 (1913), it was held that laches is an equitable defense and will not bar a recovery from mere lapse of time nor where there is a reasonable excuse for nonaction of a party in making inquiry as to his rights or in *asserting* them." 6 Kan. App. 2d at 98.

In its legal conclusions, the trial court noted:

"The Court finds as somewhat contradictory the defendants' claim that laches should apply to the present situation. It appears from the evidence that Glenwood Manor, Inc. and the Partnership were quite careful to make sure that little or no information was leaked to the public at large or to the plaintiff in particular concerning the nature of the operating change. They, of course, were not required to, but they cannot now be heard to say that the bank was remiss for not finding out what they were so eager to conceal. It is also unusual for them to contend that the bank blithely allowed the arrangement while simultaneously flogging them with the equitable defenses set out above that charged them with rapaciousness.

"The Court would find that as soon as the bank could reasonably have expected to find out about the changes, that it acted with alacrity to assert its rights."

In December 1980, the first purchase agreement was executed with possession date being set at February 23, 1981. The second purchase agreement was executed in November 1981. The plaintiff did not learn of either of these changes in ownership until the spring of 1982 when one of its employees read a newspaper article which alerted plaintiff on the need to investigate the matter. After ascertaining the facts, plaintiff tried to reach an arrangement with defendants satisfactory to all. This attempt failed and suit was filed in September 1982. We find no error in the trial court's refusal to apply the equitable defense of laches herein.

For their second issue defendants contend the trial court erred in refusing to hold the "due-on-sale" clause was unenforceable for failure of the plaintiff to establish its security was impaired by the ownership changes. Defendants have cited cases from other jurisdictions in support of this contention. *E.g., Tucker v. Pulaski Fed. S & L,* 252 Ark. 849, 481 S.W.2d 725 (1972); *Patton v. First Fed. Sav. & Loan Ass'n, Etc.,* 118 Ariz. 473, 578 P.2d 152 (1978); *Nichols v. Ann Arbor Savings,* 73 Mich. App. 163, 250 N.W.2d 804, *appeal denied* 400 Mich. 844 (1977). The concept that an institutional lender must show security impairment before a due-on-sale clause will be enforceable apparently arose in California or, at least, found strength there which had not previously been displayed in other jurisdictions. See *Tucker v. Lassen Sav. & Loan Assn.,* 12 Cal. 3d 629, 116 Cal. Rptr. 633, 526 P.2d 1169 (1974). In *Wellenkamp v. Bank of America,* 21 Cal. 3d 943, 148 Cal. Rptr. 379, 582 P.2d 970 (1978), the California Supreme Court held an institutional lender could not enforce a due-on-

sale clause in a promissory note or deed of trust unless the lender could demonstrate that enforcement was reasonably necessary to prevent impairment of the security or risk of default. The so-called *"Wellenkamp"* rule did not long go unchallenged in the federal court system. In *Fidelity Federal Sav. & Loan Assn. v. De La Cuesta,* 458 U.S. 141, 73 L.Ed.2d 664, 102 S.Ct. 3014 (1982), the United States Supreme Court was confronted with a California case where the California courts had applied the *"Wellenkamp"* rule. The savings and loan association therein, which was federally chartered (like Capitol Federal herein), contended federal law and regulations preempted state law in this area. The United States Supreme Court agreed.

The high court provided an extensive review of federal law in this area beginning with the Home Owners' Loan Act of 1933 (HOLA), 12 U.S.C. § 1461 *et seq.* The court noted in 1976 the Federal Home Loan Bank Board became concerned about the increasing controversy as to the authority of federal savings and loan associations to exercise "due-on-sale" clauses. 458 U.S. at 145. As the United States Supreme Court observed:

"[T]he Board felt that restrictions on a savings and loan's ability to accelerate a loan upon transfer of the security would have a number of adverse effects: (1) that 'the financial security and stability of Federal associations would be endangered if . . . the security property is transferred to a person whose ability to repay the loan and properly maintain the property is inadequate'; (2) that 'elimination of the due on sale clause will cause a substantial reduction of the cash flow and net income of Federal associations, and that to offset such losses it is likely that the associations will be forced to charge higher interest rates and loan charges on home loans generally'; and (3) that 'elimination of the due on sale clause will restrict and impair the ability of Federal associations to sell their home loans in the secondary mortgage market, by making such loans unsalable or causing them to be sold at reduced prices, thereby reducing the flow of new funds for residential loans, which otherwise would be available.' 41 Fed. Reg. 6283, 6285 (1976). The Board concluded that 'elimination of the due on sale clause will benefit only a limited number of home sellers, but generally will cause economic hardship to the majority of home buyers and potential home buyers.' Ibid." 458 U.S. at 146.

The Board issued a regulation in 1976 governing due-on-sale clauses. The regulation, now codified as 12 C.F.R. § 545.8-3(f) (1983) (originally codified as 12 C.F.R. § 545.6-11(f) [1980]), provides in pertinent part:

"[A federal savings and loan] association continues to have the power to include, as a matter of contract between it and the borrower, a provision in its loan

instrument whereby the association may, at its option, declare immediately due and payable sums secured by the association's security instrument if all or any part of the real property securing the loan is sold or transferred by the borrower without the association's prior written consent. Except as [otherwise] provided in . . . this section . . . , exercise by the association of such option (hereafter called a due-on-sale clause) shall be exclusively governed by the terms of the loan contract, and all rights and remedies of the association and borrower shall be fixed and governed by that contract." 458 U.S. at 146-47.

In promulgating this regulation the Board explained its intent the due-on-sale practices of federally-chartered savings and loans, like Capitol Federal, be governed " 'exclusively by Federal law.' " 41 Fed. Reg. 18286, 18287 (1976). The Board emphasized that " '[f]ederal associations shall not be bound by or subject to any conflicting State law which imposes different . . . due-on-sale requirements.' " 458 U.S. at 147.

The United States Supreme Court reviewed its decisions on the constitutional doctrine of federal preemption, 458 U.S. at 152-54, and then noted California courts, by requiring federal savings and loan associations to show impairment of security in seeking enforcement of due-on-sale clauses, had limited a federal association's right to exercise such clauses. 458 U.S. at 154-55. The high court held that by virtue of the so-called "*Wellenkamp*" rule (which defendants in the instant action seek to have applied here) the "California courts have forbidden a federal savings and loan to enforce a due-on-sale clause solely 'at its option' and have deprived the lender of the 'flexibility' given it by the Board." 458 U.S. at 155.

In *De La Cuesta* the United States Supreme Court rejected the contention the Home Owners Loan Act, 12 U.S.C. § 1461 *et seq.*, was not broad enough to permit the Board to promulgate its due-on-sale regulation. As the high court observed, "Congress delegated to the Board broad authority to establish and regulate 'a uniform system of [savings and loan] institutions where there are not any now,' and to 'establish them with the force of the government behind them, with a national charter.' " 458 U.S. at 166. Continuing:

"Although the Board's power to promulgate regulations exempting federal savings and loans from the requirements of state law may not be boundless, in this case we need not explore the outer limits of the Board's discretion. We have no difficulty concluding that the due-on-sale regulation is within the scope of the Board's authority under the HOLA and consistent with the Act's principal purposes." 458 U.S. at 167.

Concluding:

"Admittedly, the wisdom of the Board's policy decision is not uncontroverted. But neither is it arbitrary or capricious. As judges, it is neither our function, nor within our expertise, to evaluate the economic soundness of the Board's approach. In promulgating the due-on-sale regulation, the Board reasonably exercised the authority, given it by Congress, so as to ensure the financial stability of 'local mutual thrift institutions in which people . . . invest their funds and . . . [which] provide for the financing of homes.' § 5(a) of the HOLA, 12 U.S.C. § 1464(a) (1976 ed., Supp. IV). By so doing, the Board intended to pre-empt conflicting state restrictions on due-on-sale practices like the California Supreme Court's *Wellenkamp* doctrine.

"Our inquiry ends there. Accordingly, we hold that the Board's due-on-sale regulation bars application of the *Wellenkamp* rule to federal savings and loan associations." 458 U.S. at 169-70.

See also *First Federal S & L Ass'n of Lake Worth v. Brown,* 707 F.2d 1217, 1221 (11th Cir. 1983); Note, *Due-on-Sale Clauses: The Economic and Legal Issues,* 43 U. Pitt. L. Rev. 441 (1982); Comment, *The Due-On-Sale Clause: Current Legislative Actions and Probable Trends,* 9 Fla. St. U. L. Rev. 645 (1981); Dunn & Nowinski, *Enforcement of Due-On-Transfer Clauses: An Update,* 16 Real Prop. Prob. & Tr. J. 291 (1981); Note, *Enforcement of Due-On-Transfer Clauses: A Review and Commentary of the State of the Law on Enforceability of Acceleration Provisions In Mortgages and Deeds of Trust by Reason of Transfer of an Interest in Security,* 13 Real Prop. Prob. & Tr. J. 891 (1978).

In light of *De La Cuesta* the assertion by the defendants here that Capitol Federal Savings & Loan Association must demonstrate an impairment of security before it may enforce the "due-on-sale" clause in the 1978 mortgage must be rejected. We conclude the trial court properly held *De La Cuesta* was controlling on this issue.

For its third issue defendants contend the due-on-sale clause is a restraint on alienation of property and must be strictly construed against the lender in determining whether the transactions herein "sold, conveyed, or otherwise alienated" the mortgaged property and thereby triggered the operation of the clause.

There is no question but that restraints on alienation of property are to be strictly construed against the party urging the restraint. *Wood v. Hatcher,* 199 Kan. 238, Syl. ¶ 2, 428 P.2d 799 (1967). However, is a due-on-sale clause a restraint on alien-

ation? While some authority may be found supporting the proposition such clauses are a restraint, *e.g., Consol. Capital Properties v. Nat. Bank,* 420 So. 2d 618, 621 (Fla. Dist. Ct. App. 1982), the better view and reasoning, as expressed in *Occidental Sav. & Loan Assn. v. Venco Partnership,* 206 Neb. 469, 293 N.W.2d 843 (1980), is that due-on-sale clauses do not constitute a restraint on alienation. While lengthy, it is appropriate to set forth in some detail the Nebraska Supreme Court's opinion in *Occidental* to demonstrate the rationale of holding due-on-sale clauses are not restraints on alienation. The Nebraska Supreme Court, in *Occidental,* stated in part:

"Most of the cases which have considered this issue have started their analysis by concluding without much discussion that the 'due-on-sale' clause is a restraint on alienation. They have then either upheld the clause or struck it down depending on whether they thought that, under the particular facts, the restraint was reasonable. Likewise, appellants herein urge this court to find that the 'due on sale' clause is an unreasonable restraint on alienation, absent the mortgagee pleading and proving that the security is impaired; while the appellees urge us to find that the clause is a reasonable restraint on alienation. We believe that the error committed by most jurisdictions in deciding this matter is their willingness to assume that a 'due on sale' clause is a restraint on alienation and that the only issue is reasonableness. In our view, the 'due on sale' clause is not a restraint on alienation as that concept is legally defined.

"Both parties seem to concede that the language in the questioned clause is not, in a technical sense, a direct restraint on alienation but appellants maintain that the clause has the practical effect of a restraint on alienation and, therefore, should be struck down unless necessary to protect the lender's security.

"An examination of the law pertaining to restraints on alienation makes it clear that a 'due on sale' clause is not a restraint on alienation and cannot be so considered for any purpose, theoretical or practical.

"The Restatement of Property § 404 (1944) defines a restraint on alienation as follows:

" '(1) A restraint on alienation, as that phrase is used in this Restatement, is an attempt by an otherwise effective conveyance or contract to cause a later conveyance

(a) to be void; or

(b) to impose contractual liability on the one who makes the later conveyance when such liability results from a breach of an agreement not to convey; or

(c) to terminate or subject to termination all or a part of the property interest conveyed. `

" '(2) If a restraint on alienation is of the type described in Subsection (1), Clause (a), it is a disabling restraint.

" '(3) If a restraint on alienation is of the type described in Subsection (1), Clause (b), it is a promissory restraint.

" '(4) If a restraint on alienation is of the type described in Subsection (1), Clause (c), it is a forfeiture restraint.'

"One need simply read the various subparts of § 404 to conclude that a 'due on sale' clause does not, in any manner, bring about any of the effects noted there and cannot, therefore, be a direct restraint on alienation.

"The questioned clause in no manner precludes the owner-mortgagor from conveying his property. The owner is free to convey without legal restraint and the conveyance does not cause a forfeiture of the title, but only an acceleration of the debt.

"It is true that the possibility of acceleration may impede the ability of an owner to sell his property as he wishes; nonetheless, not every impediment to a sale is a restraint on alienation, let alone contrary to public policy. It is a fact that zoning restrictions, building restrictions, or public improvements may impede the sale and substantially affect the ability of an owner to realize a maximum price. Yet no one suggests that such restrictions or covenants, as a class, are invalid simply because they affect the ease with which one may dispose of one's property. We are somewhat at a loss to understand how or why so many courts have been willing to describe a 'due on sale' clause as a restraint on alienation and we are unwilling to do so. Therefore, we begin our analysis by holding that 'due on sale' clauses are not direct restraints on alienation within the meaning of the law.

"Appellants next argue that, if a 'due on sale' clause is not a direct restraint on alienation and, therefore, void, it is, at least, an unreasonable *indirect* restraint on alienation which should be declared invalid and unenforceable as a matter of public policy unless a mortgagee pleads and proves that his security is in jeopardy. That argument may be due, in part, to some overly broad language in our decision in *Cast v. National Bank of Commerce T. & S. Assn.*, 186 Neb. 385, 391, 183 N.W.2d 485, 490 (1971), wherein we said:

" 'A majority of this court, including the writer, has come to the conclusion that the law is the same on direct and indirect restraints on alienation. The authorities are not in accord on the question. While much has been written on the subject, we adopt the following as a proper statement of the law: "As used in this treatise, the expression 'restraint on alienation' refers not merely to the restriction of the legal power of alienation, but also to the restriction of alienability as a practical matter. Any provision in a deed, will, contract, or other legal instrument which, if valid, would tend to impair the marketability of property, is a restraint on alienation.' " Simes and Smith, The Law of Future Interests (2d Ed.), § 1111, p. 4. 'In brief, the law is concerned primarily with practical alienability, not with a theoretical power of alienation.' Simes and Smith, The Law of Future Interests (2d Ed.), § 1115, p. 8.

"Whatever an indirect restraint on alienation as envisioned by us in *Cast* may be, a 'due on sale' clause in a mortgage does not fall within that category. We perhaps were overly generous in our statement in *Cast* that '[a]ny provision . . . which, if valid, would tend to impair the marketability of property, is a restraint on alienation.' *Id.* (Emphasis supplied.) As we have already observed with regard to zoning restrictions and building restrictions, some covenants may impair the marketability of property and yet not be restraints on alienation, direct or indirect, as that concept is known in the law. As an example, a covenant in a deed that requires the dedication of property solely to residential purposes is not a restraint on alienation even if the owner could sell the property

at a higher price for commercial purposes. The most that need be said about *Cast* is that the restriction in question affected the validity of title and totally precluded the fee title owner from transferring title for a period of 25 years. There is no similarity between the language of the will in the *Cast* case and a common 'due on sale' clause in a mortgage.

"The difficulty in attempting to determine the validity of a contract based upon some notion of an indirect restraint on alienation and a concept of 'practical inalienability' is that there is no framework within which a court may operate. Parties to a contract can never know, absent litigation, whether the contract is valid or not. Such a result is undesirable and should be avoided if possible." 206 Neb. at 471-75.

### Continuing:

"*The restraint, if any, in this case does not attach itself to the title and the conveyance thereof but rather to the mortgage and the assumption thereof. The lender never promised the seller that another could assume the mortgage; as a matter of fact, it told the seller the contrary. Should we, therefore, ignore the plain terms of the contract and look for some hidden intention, unsupported by evidence?*" 206 Neb. 478-79. (Emphasis supplied.)

### Concluding (after a discussion of a public policy argument):

"We are cited to no authority, nor are we able to find any, which would legally justify declaring a contract provision such as the one in the instant case, generally referred to as a 'due on sale' clause, to be contrary to public policy and void. Generally, a 'due on sale' clause contained in a mortgage contract is not contrary to the public policy of this jurisdiction and is, therefore, valid and enforceable." 206 Neb. 481.

In summary, the Nebraska Supreme Court held in *Occidental* that due-on-sale contracts are neither direct nor indirect restraints on alienation and are not generally contrary to public policy.

*Occidental* has found increasing favor with American courts. *In Society for Sav. v. Bragg*, 38 Conn. Supp. 8, 444 A.2d 919 (1981), the Superior Court of Connecticut in rejecting the argument due-on-sale clauses were restraints on alienation, commented:

"Some jurisdictions, in addressing the issue of the validity of a due-on-sale clause, have held that it is a restraint on alienation. See, e.g., *Tucker v. Pulaski Federal Savings & Loan Assn.*, 252 Ark. 849, 853-58, 481 S.W.2d 725 (1972); *Malouff v. Midland Federal Savings & Loan Assn.*, 181 Colo. 294, 301, 509 P.2d 1240 (1973); *People's Savings Assn. v. Standard Industries, Inc.*, 22 Ohio App. 2d 35, 37, 257 N.E.2d 406 (1970); *Continental Federal Savings & Loan Assn. v. Fetter*, 564 P.2d 1013 (Okl. 1977). This court disagrees. It finds that such unfavorable holdings rest on an insufficient analysis of this issue. It approves of the following recent statement by the Supreme Court of Nebraska: 'We believe

that the error committed by most jurisdictions in deciding this matter is their willingness to assume that a "due on sale" clause is a restraint on alienation and that the only issue is reasonableness. In our view, the "due on sale" clause is not a restraint on alienation as that concept is legally defined.' *Occidental Savings & Loan Assn. v. Venco Partnership,* 206 Neb. 469, 471, 293 N.W.2d 843 (1980)." 38 Conn. Supp. at _____, 444 A.2d at 924.

The Connecticut court, like the Nebraska Supreme Court, held due-on-sale clauses did not fall within the general definition of a restraint of alienation as that concept is presented in Restatement of Property § 404 (1944).

In *Williams v. First Fed. Sav. & Loan Ass'n, Etc.,* 651 F.2d 910, 923, n. 29 (4th Cir. 1981), the Fourth Circuit Court of Appeals followed *Occidental.* The federal intermediate appellate court observed due-on-sale clauses could not be viewed in isolation. Such clauses are but one piece in the larger puzzle of real estate financing. 651 F.2d at 924. In *Williams* the Fourth Circuit noted succinctly, "[L]enders have legal rights, too. If they have complied with all requirements of the law, *they are entitled to enforce their due-on-sale clauses, for they are simply not restraints on alienation.*" 651 F.2d at 926. (Emphasis supplied.)

We conclude due-on-sale clauses such as that before us are neither direct nor indirect restraints on alienation of property. Therefore, strict construction against the lender is not required on defendants' assertion that such are restraints on alienation of property.

Finally, defendants contend the trial court erred in finding the transactions herein constituted a sale, conveyance or alienation within the meaning of the due-on-sale clause.

The trial court found the two designated "purchase agreements," first between Glenwood Manor, Inc., and the Partnership and then between the Partnership and Lederman (with Meadow Hills West Associates Ltd., of Colorado acting as a go-between), to be, in fact, installment land sales contracts. Defendants, basically, do not challenge this finding. Under the December 23, 1980, agreement between Glenwood Manor, Inc., and the Partnership, the latter obtained immediate possession of the hotel, acquired the sole right to manage and operate the business, acquired the right to receive all rents from the business operations, obtained ownership to all equipment, fixtures, and furnishings, and acquired all outstanding contracts and leasing

agreements possessed by Glenwood Manor. The consideration Glenwood Manor, Inc., received from the Partnership was $1,000,000 in cash paid on February 23, 1981, and, on the same date, the Partnership delivered to Glenwood Manor, Inc., a promissory note for $1,500,000. Additionally, the Partnership agreed to pay $1,300,000.00 to Glenwood Manor, Inc., on June 10, 1988, at which time Glenwood Manor, Inc., would convey a warranty deed to the Partnership. Finally, under the Glenwood Manor-Partnership agreement, the Partnership was obligated to make the monthly mortgage payments Glenwood Manor, Inc., had to pay to Capitol Federal under the 1973 mortgage. The rights the Partnership had obtained from Glenwood Manor, Inc., were subsequently acquired by Lederman on December 24, 1981. Lederman then caused to be filed in the Register of Deeds Office in Johnson County, Kansas, an affidavit of equitable interest in the property Capitol Federal had a mortgage upon. There seems to be no dispute between the parties that at the end of all these transactions Lederman possessed an equitable interest in the realty but Glenwood Manor was still the registered title owner. The question which confronted the trial court and now challenges this Court is whether, under such circumstances, there had been a sale, conveyance or alienation of the mortgaged real estate so as to trigger the due-on-sale clause?

In *Morris v. Matthews*, 263 Ark. 298, 564 S.W.2d 509 (1978), the crucial word in the acceleration clause was "sell" and the question for the Arkansas Supreme Court was whether a conditional contract of sale triggered the clause. The Arkansas Supreme Court held the conditional contract for sale did invoke the clause. 263 Ark. at 299.

In *Bakker v. Empire Sav., Bldg. & Loan Ass'n*, 634 P.2d 1021 (Colo. App. 1981), the Colorado Court of Appeals considered two acceleration clauses. The first clause was triggered upon the "*sale or transfer* of the real property" while the second was operable when the property was "*conveyed.*" 634 P.2d at 1022. *Bakker* involved an installment land sales contract, like here, and the intermediate Colorado appellate court held under either, the due-on-sale provision had been triggered. *Rustic Hills v. Columbia Sav. & L. Ass'n*, 661 P.2d 254 (Colo. 1983), found the Colorado Supreme Court faced with a contention an installment land contract did not trigger a due-on-sale clause which provided

it was invoked upon the "sale or transfer of the real property." In rejecting this argument the Colorado court compared and contrasted installment contracts with outright sales.

"Installment sales and outright sales differ in form and in the time they take to complete, but their substance is the same for purposes of a due-on-sale clause in a deed of trust. In the case of an installment land contract, both possession and equitable title are in the purchaser, with the seller retaining bare legal title, thus posing the same threats to the lender's economic interests as are posed by an outright sale. *See Carpenter v. Winn*, 39 Colo. App. 238, 566 P.2d 370 (1977); *Mutual Federal Savings & Loan Association v. Wisconsin Wire Works*, 58 Wis. 2d 99, 205 N.W.2d 762 (1973) ('In view of common and technical usage of the term "convey" and the purpose of the "due-on-sale clause" of the mortgage and note, there is no ambiguity. The land contract was a conveyance that gave the purchaser an equitable title to the property as well as the immediate right to possession'). *Williams v. First Federal Savings & Loan Association*, 651 F.2d 910 (4th Cir. 1981). *See also* Dunn & Nowinski, *Enforcement of Due-on-Transfer Clauses: An Update*, 16 Real Prop., Prob. & Tr. J. 291 (1981) (pointing out that with the exception of a Florida District Court of Appeals decision, *courts have uniformly held that sale by installment land contract is a sale or transfer for purposes of the due-on-sale clause*). Moreover, the purchaser under an installment contract assumes the risk of loss and receives any appreciation in value." 661 P.2d at 256.

The New Jersey Superior Court, Chancery Division, in *Century Fed. Sav. & Loan Assn. v. Van Glahn*, 144 N.J. Super. 48, 364 A.2d 558 (1976), was faced with a due-on-sale clause which spoke of "change in ownership." The court held: (1) a contract for sale of land operated as an equitable conversion; (2) "convey" applied to any transfer of title to the mortgaged property, whether such transfer be legal or *equitable;* and (3) the fact the mortgagor still held legal title to the property would not stop the invocation of the due-on-sale clause.

In January, 1982, the Virginia Supreme Court handed down two decisions involving due-on-sale clauses. In *Lipps v. First American Serv. Corp.*, 223 Va. 131, 286 S.E.2d 215 (1982), the borrower had executed an agreement with the financial institution which contained a clause permitting acceleration if the mortgaged property was "sold or transferred." 223 Va. at 133. Subsequently the borrower entered into an agreement with a third party which was entitled a "Land Contract for Sale of Improved Real Property - Virginia." 223 Va. at 134. The status of the borrower in *Lipps* as compared to the status of Glenwood Manor, Inc., here, is similar. 223 Va. at 139. In holding the due-on-sale clause had been triggered the Virginia court said:

"*Sale v. Swann,* 138 Va. 198, 208, 120 S.E. 870, 873 (1924), is controlling, and there we said:

" 'When such a contract is concluded, although it is wholly executory in form, it clothes the purchaser with an equitable estate in the land and the vendor with an equitable ownership of the purchase money. This because equity treats that as done which ought to be done by the terms of such a contract, and as the land ought to be conveyed to the vendee and the purchase money transferred to the vendor, equity regards these as done, and treats the vendee as having acquired property in the land, and the vendor as having acquired property in the price. It follows that as the vendee has thus acquired the full equitable estate, he may convey or encumber it, devise it; if he dies intestate it descends to his heirs at law; his wife is entitled to dower in it, and specific performance may be enforced against his heirs at law after death. *In fact, all the incidents of a real ownership belong to it.'* Accord, *Carmichael v. Snyder,* 209 Va. 451, 455, 164 S.E.2d 703, 706 (1968).

"We therefore hold that Covenant 17 of the deed of trust was breached by the execution of the Land Contract by Borrowers and Purchaser on April 21, 1979." 223 Va. at 140. (Emphasis supplied.)

The other Virginia case decided the same day as *Lipps* was *United Va. Bank/Nat. v. Best,* 223 Va. 112, 286 S.E.2d 221, *cert. denied* 459 U.S. 879 (1982). In *United Va. Bank* the same result as *Lipps* was achieved with regard to a contract to purchase property.

The Washington Court of Appeals in *Terry v. Born,* 24 Wash. App. 652, 604 P.2d 504 (1979), said although the term "conveyance" in a strict legal sense meant the transfer of legal title to land it also denoted any transfer of title, legal or equitable. 24 Wash. App. at 654. The *Terry* court relied upon the Wisconsin Supreme Court's opinion in *Mutual Fed. S. & L. Asso. v. Wisconsin Wire Wks.,* 58 Wis. 2d 99, 205 N.W.2d 762 (1973), 69 A.L.R.3d 702, (*Wisconsin Wire I*) for its decision conveyance meant the legal or equitable transfer of property. In *Wisconsin Wire I* the Wisconsin court dealt with an acceleration clause which was triggered upon "a conveyance or other transfer." 58 Wis. 2d at 102. The mortgagor executed a land contract to sell with a third party. Neither the mortgagor nor the third-party advised the plaintiff-mortgagee about the contract. The land contract was recorded with a county register of deeds office and subsequently, when the plaintiff learned of the transaction it invoked the acceleration clause of the mortgage and declared the loan to Wisconsin Wire Works to be due and payable. Mutual Federal Savings & Loan brought a foreclosure action which was dismissed by the Wisconsin lower court. The savings and loan

association appealed and the Wisconsin Supreme Court reversed the lower court. In so doing the Wisconsin high court said:

"One definition of 'convey' appears in Webster's, *Third International Dictionary* (1965): 'To transfer or deliver (as property) to another; *specif:* to transfer (as real estate) or pass (a title, as to real estate) by a sealed writing.' *The term 'convey' applies to any transfer of title to the mortgaged property whether legal or equitable.* By the execution of a land contract which conferred equitable title on Megal, Wisconsin Wire Works conveyed away the mortgaged premises. The contractual term is not ambiguous. In the parlance of both laymen and lawyers, *a land contract is a conveyance.*

"In view of common and technical usage of the term 'convey' and the purpose of the 'due on sale clause' of the mortgage and note, there is no ambiguity. *The land contract was a conveyance that gave the purchaser an equitable title to the property as well as the immediate right to possession.*" 58 Wis. 2d at 105. (Emphasis supplied.)

See also *Mutual Fed. S. & L. Asso. v. Wisconsin Wire Wks.*, 71 Wis. 2d 531, 239 N.W.2d 20 (1976) (*Wisconsin Wire II*).

An excellent review of the case law in this area may be found at Annot., What Transfers Justify Acceleration Under "Due-On-Sale" Clause of Real-Estate Mortgage, 22 A.L.R.4th 1266. See also Annot., Validity, Construction, and Application of Clause Entitling Mortgagee to Acceleration of Balance Due in Case of Conveyance or Transfer of Mortgaged Property, 69 A.L.R.3d 713.

We conclude the trial court did not err in holding the transactions herein had triggered the due-on-sale clause. The transfer of equitable title to the real estate coupled with immediate right to possession thereof is clearly a conveyance under the due-on-sale clause of the mortgage.

The judgment is affirmed.

HOLMES, J., not participating.