No. 66,072

WARREN BROWN GILLESPIE and POLLY GILLESPIE TOWNSEND, *Plaintiffs/Appellees/Cross-Appellants*, v. DOROTHEA WOFFORD SEYMOUR, as Co-Trustee of the BROWN-GILLESPIE TRUST ESTATE; RUTH BASSETT; ROBERT W. BURDGE; and GRANT-THORNTON, an accounting partnership, *Defendants*, and DOROTHEA WOFFORD SEYMOUR, individually; PAUL A. SEYMOUR, JR.; PAUL SEYMOUR, III; ARROWHEAD PETROLEUM, INC., and BIG SPRINGS DRILLING, INC., *Defendants/Appellants/Cross-Appellees*, and DOROTHEA WOFFORD SEYMOUR, as Co-Trustee of the BROWN GILLESPIE TRUST ESTATE; and DOROTHEA WOFFORD SEYMOUR, Individually, *Defendants/Third-party Plaintiffs*, v. JAMES PAUL GILLESPIE, Executor of the Estate of PAULINE BROWN GILLESPIE, Deceased, *Third-party/Defendant*.

In the Matter of the Estate of PAULINE BROWN GILLESPIE, Deceased.

(823 P.2d 782)

124

Opinion

filed December 17, 1991.

*Jerry D. Bogle,* of Young, Bogle, McCausland, Wells & Clark, P.A., of Wichita, argued the cause, and *Glenn D. Young, Jr.,* and *Patrick C. Blanchard,* of the same firm, were with him on the briefs for appellees/cross-appellants.

*Robert Martin,* of Martin, Pringle, Oliver, Wallace & Swartz, of Wichita, argued the cause, and *Terry L. Mann,* of the same firm, was with him on the briefs for appellants/cross-appellees.

*Ron Campbell,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, and *George T. Bogert, Stanley J. Parzen,* and *Michele Odorizzi,* of Mayer, Brown & Platt, of Chicago, Illinois, were on the brief for *amici curiae* Grant-Thornton and Robert W. Burdge.

The opinion of the court was delivered by

McFARLAND, J.: This is an action by beneficiaries of a trust for recovery of damages for oil and gas investments made by the Trust.

The case before us was determined in a bench trial and involves a very complex factual situation as witnessed by the trial court's entry of over 200 findings of fact. A highly summarized statement of the facts is as follows. Warren Brown was a wealthy Wichita businessman. In 1956, Mr. Brown created two revocable inter vivos trusts. His two children, Dorothy Brown Wofford and Pauline Brown Gillespie, were the co-trustees of each trust. In the trust instruments, the trustees were vested with full legal and equitable title to the trust property; the effect of such language will be discussed in the standing issue of this opinion. Broad powers were granted to the trustees as to the investment of trust property, to-wit:

"(g) The Trustees may invest, reinvest, and keep invested the trust estate and all property from time to time remaining in and comprising the same, in any or every kind of property, whether real or personal, tangible or intangible, and wheresoever situated, as the Trustees in their discretion deem advisable, without regard to whether any such investments are authorized by any law, rule, statute, regulation, or custom pertaining to the investment of trust funds by Trustees, intending hereby to empower the Trustees to be guided solely by what in their discretion is deemed to be for the best interests of the trust estate."

The two trusts held substantially equal assets of stocks, bonds, and bank stock. Warren Brown died shortly after the creation of the trusts. The assets of each trust were initially valued at $392,015. The Internal Revenue Service later reappraised the assets at $1,647,687.66, resulting in additional estate taxes being paid by each trust of $700,000.

Each of the co-trustee daughters was in her 60's when the trusts were created. One of the trusts was for the benefit of Wofford and her four children (Wofford Trust), and the other was for the benefit of Gillespie and her two children (Gillespie Trust). With the approval of Wofford (or her successor trustee), Gillespie could withdraw any or all income as well as the corpus of the Gillespie Trust. Wofford had like rights in the Wofford Trust. After the death of Warren Brown, Gillespie was the dominant figure in the investment of trust assets held by each trust.

In 1973, Wofford died and the Wofford Trust terminated, with the trust assets being distributed among Wofford's four children. At that time, each trust had a value of approximately $3,000,000. Pursuant to the terms of the Gillespie Trust, Dorothea Wofford Seymour (Wofford's daughter) succeeded as co-trustee of the Gillespie Trust.

We turn now to how oil and gas investments became involved. Gillespie had been making personal investments in oil and gas interests dating at least from the early 1950's. In the late 1950's Dorothea Wofford Seymour (Dorothea) and her husband, Paul Seymour, Jr. (Seymour), created a corporation, Arrowhead Petroleum, Inc. (Arrowhead). Dorothea owned 49 percent of the stock and Seymour owned the remaining 51 percent. Seymour managed the company. Shortly after the creation of Arrowhead, Gillespie commenced making her personal oil and gas investments exclusively with Arrowhead. Gillespie was concerned over the amount of income tax each trust was paying on its investment profits. In 1965, each trust's tax liability was over $67,000. Gillespie kept the records on each trust with the assistance of accountants and made the final decision on investments for the trusts, although approval therefor was required by her co-trustee (Wofford and, later, Dorothea). The co-trustee deferred to Gillespie's judgment in these matters.

In 1965, to reduce income tax liability, each trust began investing in oil and gas interests. All such investments were through Arrowhead. The investments of each trust with Arrowhead were $34,626.29 in 1965. Dorothea did not participate in the management of Arrowhead. Oil and gas investments were made on the basis of discussions and negotiations between Gillespie and Seymour with some involvement by certain accountants (the nature and extent of such involvement will not be discussed in any detail as the same is the subject of a yet to be determined aspect of this litigation, as will be set forth later in the opinion). All trust checks required the signature of both trustees. Between 1965 and 1973, each trust paid Arrowhead exactly the same amounts on the same dates and received the same interests in the same leases. In 1968, Gillespie determined that in order to achieve maximum tax benefits from the oil and gas investments for the two trusts, it would be best to make block investments with Arrowhead of amounts determined early in each calendar year. All block investments were from trust income. An attorney and an accountant were consulted who saw no problem with this procedure. Under the block investment program, any excess remaining at the end of the year was to be applied to wells drilled rather than returned to its respective trust.

As previously stated, Wofford died in 1973 and Dorothea succeeded her at that time as co-trustee of the Gillespie Trust (hereafter, Trust). The Wofford Trust was terminated. The continuing Trust made block investments with Arrowhead between 1974 and 1987 of yearly amounts ranging from $110,000 to $300,000.

In the winter of 1987, the plaintiffs herein, Warren Brown Gillespie and Polly Gillespie Townsend (children of Gillespie) brought an action against Dorothea as co-trustee seeking an accounting of the Trust's investments with Arrowhead. On February 2, 1988, Gillespie died at age 92. At the time of her death, the Gillespie Trust contained assets in excess of $11,000,000. On June 27, 1988, the petition was amended, seeking compensatory and punitive damages from Dorothea, individually and as co-trustee, Seymour, Paul Seymour, III, Arrowhead, Big Springs Drilling, Inc. (Big Springs Drilling), Ruth Bassett, Robert W. Burdge, and Grant-Thornton (an accounting partnership) arising from alleged mismanagement of Trust funds invested in Arrowhead.

The trial court dismissed the claims against defendants Burdge and Grant-Thornton and certified the judgment to be final pursuant to K.S.A. 1990 Supp. 60-254(b). The plaintiffs appealed therefrom. The Court of Appeals affirmed in part, reversed in part, and remanded the case for further proceedings. Specifically, the Court of Appeals held that a cause of action had been stated for "breach of trust against the accountants for conspiracy to overcharge the trust account and participation in overcharging the account." *Gillespie v. Seymour,* 14 Kan. App. 2d 563, 572, 796 P.2d 1060 (1990). No further action has apparently been taken in that matter; presumably, it is waiting resolution of this appeal.

The trial court herein held that by virtue of assorted wrongdoings by the defendants, the Trust had been damaged in the amount of $2,476,422. To this, the trial court added tax allowances of $843,607 for a total judgment of $3,320,029 through December 31, 1987. Between said date and the date of judgment (December 14, 1990) interest was allowed on the judgment in amounts ranging from 9.5 percent to 11 percent. The aggregate judgment was in excess of $4,000,000. Dorothea, Seymour, and Arrowhead were held to be jointly and severally liable on the entire amount. Paul Seymour, III, was held jointly and severally liable for 87.92 percent of the total damages.

Additionally, punitive damages for the period prior to July 1, 1987, were assessed as follows:

| | |
|---|---|
| Dorothea: | $2,000,000 |
| Seymour: | $2,000,000. |
| Paul Seymour, III: | $   25,000. |

For the period after July 1, 1987, punitive damages were awarded as follows:

Dorothea and Seymour,
        jointly and severally: $ 89,250

Additionally, there were some allowances involving some billings among Gillespie's estate, Big Springs Drilling, and Arrowhead which are comparatively small in amount and are not at issue herein. The judgment was certified as a final judgment pursuant to K.S.A. 1990 Supp. 60-254(b). Defendants Dorothea, Seymour, Paul Seymour, III, Arrowhead, and Big Springs Drill-

ing appealed from the judgment. The plaintiffs have filed a cross-appeal.

The foregoing statement of facts, although lengthy, provides just the framework of the background giving rise to these appeals. Additional factual details will be set forth as necessary for the discussion of particular issues.

Before proceeding to the issues, the applicable scope of review needs to be stated. As we held in *Williams Telecommunications v. Gragg*, 242 Kan. 675, 676, 750 P.2d 398 (1988):

"Where the trial court has made findings of fact and conclusions of law, the function of this court on appeal is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. *Moore v. R. Z. Sims Chevrolet-Subaru, Inc.*, 241 Kan. 542, Syl. ¶ 3, 738 P.2d 852 (1987); *Friedman v. Alliance Ins. Co.*, 240 Kan. 229, Syl. ¶ 4, 729 P.2d 1160 (1986). Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, Syl. ¶ 2, 681 P.2d 1038, *cert. denied* 469 U.S. 965 (1984). Stated in another way, 'substantial evidence' is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. *Kansas Dept. of Health & Environment v. Banks*, 230 Kan. 169, 172, 630 P.2d 1131 (1981)."

This court's review of conclusions of law is unlimited. *U.S.D. No. 352 v. NEA-Goodland*, 246 Kan. 137, 140, 785 P.2d 993 (1990).

## ESTOPPEL

For their first issue on appeal, defendants contend the trial court erred in not concluding that the plaintiffs' claims were barred by the doctrine of estoppel.

Equitable estoppel is the effect of the voluntary conduct of a party whereby it is precluded, both at law and in equity, from asserting rights against another person relying on such conduct. A party seeking to invoke equitable estoppel must show that the acts, representations, admissions, or silence of another party (when it had a duty to speak) induced the first party to believe certain facts existed. There must also be a showing the first party rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. There can be no equitable estoppel if any essential

element thereof is lacking or is not satisfactorily proved. Estoppel will not be deemed to arise from facts which are ambiguous and subject to more than one construction. *Ram Co. v. Estate of Kobbeman*, 236 Kan. 751, Syl. ¶¶ 4, 5, 696 P.2d 936 (1985). A party may not properly base a claim of estoppel in its favor on its own wrongful act or dereliction of duty, or for acts or omissions induced by its own conduct. *Wichita Fed'l Savings & Loan Ass'n v. Black*, 245 Kan. 523, Syl. ¶ 7, 781 P.2d 707 (1989).

The defendants' position on this issue is stated in their brief as follows:

"[B]ecause Pauline Gillespie, who was both a trustee and a beneficiary, actually made and approved each of the Arrowhead investments, and waived the accounts receivable, the doctrine of estoppel bars plaintiffs' claims.

"The general rule is that a beneficiary of a trust who consents to or approves of an act, omission, or transaction by the trustee is precluded from subsequently objecting to the impropriety of such act, omission, or transaction, and cannot hold the trustee liable for any loss resulting from the act or omission, even though the conduct of the trustee may constitute a breach of duty in the administration of the trust. *Restatement (Second) of Trusts* § 216 ('[A] beneficiary cannot hold the trustee liable for an act or omission of the trustee as a breach of trust if the beneficiary prior to or at the time of the act or omission consented to it.'). *Accord* G. Bogert, *The Law of Trusts and Trustees* § 941 (1986) (equity will not permit the beneficiary to claim breach of trust by the trustee, if the beneficiary consented to the breach of trust, or participated in the breach). This rule applies with even more force to beneficiaries who are also co-trustees. *See Scullin v. Clark*, 242 S.W.2d 542 (Mo. 1951) (co-trustee and life beneficiary approved allocation of assets to corpus rather than income; personal representative of life beneficiary/co-trustee precluded from maintaining action for improper allocation of assets).

"Pauline Gillespie not only consented to and approved of the Arrowhead investments, she initiated each of the investments, and every payment to Arrowhead was made at her express direction. Obviously, Pauline Gillespie was estopped from holding Dorothea Seymour liable for those investments. Because plaintiffs receive their interest in the remainder through Pauline Gillespie, their claims are also precluded by the doctrine of estoppel.

"A decision squarely on point is *In Re Perkins' Trust Estate*, 314 Pa. 49, 170 A. 255 (1934). In that case, the lifetime beneficiary was entitled to the net income of the trust. At his death, the principal was to be distributed as he appointed. He directed that the principal would go to his wife or other contingent remaindermen. During his life, the income beneficiary prevailed upon the trustees to invest trust funds in various unsuccessful business transactions in which he had a personal interest. After the death

of the lifetime beneficiary, the contingent remaindermen sought to hold the trustees liable for the loss of trust funds.

"The court recognized that the investments were 'absolutely indefensible.' However, the court held that a life tenant with a power of appointment has an interest tantamount to a fee, and that, if the life tenant was content with the investments, his remaindermen would not be heard to complain. As aptly put by the court:

> 'Since [the lifetime beneficiary] did not, and in fact, could not have had the trustees surcharged in his lifetime, his appointee widow is accordingly now estopped from seeking such surcharge against the trustees. Likewise the contingent legatees under the will of [the lifetime benefici-ary] . . . are in the same situation. These legatees owe their inter-est . . . to the life tenant through his power of absolute appointment. As he . . . was estopped, so are those who claim through him. . . . The principle involved in this case is well summed up by the auditing judge when he says that *it is "unfair and unjust to permit a person to induce the making of investments—however unwise—and then to permit him, or any person or persons claiming through or under him, to repudiate such investments and to benefit thereby." '* (emphasis added)

*Id.* at 51. *See also Restatement (Second) of Trusts* § 216, comment h (if beneficiary consents to breach of trust, persons who take title through that beneficiary are barred from holding the trustee liable). Because the co-trustees held the legal and equitable title to all trust assets and could, without restriction and at any time, distribute all or any part of the principal and income to Pauline Gillespie, she possessed what amounted to an absolute power of appointment. During her lifetime, plaintiffs' interest in the re-mainder could have been eliminated by the stroke of a pen, and there is nothing the remaindermen could have done to prevent it. Pauline Gillespie exercised her *de facto* power of appointment in favor of the plaintiffs by choosing to leave more than $11,300,000 in the trust, and they received those funds only as a result of her decision not to take all of the trust assets. Because Pauline Gillespie could affect plaintiffs' interest in the trust, they are bound by her decisions. *See* G. Bogert, *The Law of Trusts and Trustees* § 941, at 460 (1986).

"The doctrine of estoppel directs an eminently fair result in this case. The trial court found that Pauline Gillespie made all of the decisions re-garding the trust management and investments. (Finding of Fact ¶ 135). Her children, who benefited substantially from those decisions, should not be permitted to take the benefit of her profitable decisions while disclaiming, after the fact, her unprofitable decisions. Neither should Dorothea Seymour, who relied on Pauline Gillespie's approval of the investments, be held liable because plaintiffs, who had no interest in or title to the trust assets, do not now approve of their mother's decisions."

We have no quarrel with the legal doctrines from the treatises quoted by the defendants or the rationale expressed in *Perkins's*

*Trust Estate*, 314 Pa. 49, 170 A. 255 (1934). The difficulty is that they are inapplicable herein.

Gillespie was a co-trustee and a beneficiary of the Trust. She could have received income or all or part of the corpus of the Trust as a beneficiary, but she did not. Throughout the entire 31-year existence of the Trust, no Trust assets or income were transferred to her as a beneficiary. In all of her dealings with Trust assets, income, and investments, she was acting as a co-trustee.

Plaintiffs' interests in the Trust, like Gillespie's, were established by Warren Brown, the settlor. Plaintiffs' interests, accordingly, do not arise from a power of appointment granted to Gillespie and hence do not arise from or flow through Gillespie. Even assuming Gillespie might have been estopped to bring an action against Dorothea, her co-trustee, this cannot affect plaintiffs' rights to bring this action. The plaintiffs herein did not induce the co-trustees to invest in Arrowhead. The trial court found that neither of the plaintiffs knew such investments were being made until August of 1987, when Warren Brown Gillespie saw a Trust bank statement showing checks had been written to Arrowhead.

Additionally, the trial court found that Gillespie was unaware that Seymour was overcharging the Trust for drilling expenses and allocating to the Trust, after the fact, worthless interests in dry holes.

There is no basis for application of the doctrine of estoppel herein. Defendants have not shown that Gillespie or plaintiffs induced Seymour to overcharge the Trust for drilling expenses or caused the alleged wrongful allocation of Trust interests in oil and gas leases.

This issue is without merit.

## STATUTE OF LIMITATIONS AND
## DOCTRINE OF LACHES

The plaintiffs sought and received damages for acts occurring from 1974 through 1987. Defendants contend that K.S.A. 60-513 bars any claims arising from acts occurring more than two years prior to the filing of the action herein. The trial court held that the plaintiffs' cause of action accrued in August of 1987 when

plaintiffs learned the Trust was investing in Arrowhead. Here, again, the defendants attempt to equate plaintiffs' rights with those of Gillespie—specifically, that plaintiffs' rights to the cause of action herein are identical with Gillespie's and that accrual and barring questions are determined by the time frame in which Gillespie could have maintained the action.

In *Hart v. Bank*, 105 Kan. 434, 185 Pac. 1 (1919), the original trustee of a testamentary trust disposed of trust assets under highly questionable circumstances. The successor trustee was aware of the situation and took no action against the trustee or the receiver of the assets (defendant bank). When the minor beneficiaries of the trust attained the age of 25 years and were entitled to the trust assets, they discovered the alleged wrongdoing and brought an action against the bank. This court held that because the successor trustee knew of the breach of trust and let the statute of limitations run, the beneficiaries were barred. 105 Kan. at 440. The gravamen of the claims before us is that the defendants misapplied the Trust's investments by overcharging the Trust for drilling expenses and improperly allocating oil and gas interests to it. The trial court found Gillespie had no knowledge of what it characterized as the "finagling" of Trust investments.

The trial court's determination that Gillespie had no knowledge of Seymour's "finagling" is supported by substantial competent evidence and, accordingly, cannot be disturbed upon appeal. So, even if Gillespie's knowledge could have triggered the running of the statute of limitations and plaintiffs are bound thereby, she did not have such knowledge.

Under the trial court's findings, the concealed finagling only came to light upon plaintiffs' 1987 and 1988 investigation of the Arrowhead investments. At that time the wrongful acts and the resultant injury were ascertained.

An argument could be made that plaintiffs' rights could have accrued only after Pauline's death as, prior to that time, the entire Trust estate could have been transferred to Gillespie. Had that occurred, plaintiffs, obviously, would have had no justiciable interest in how Trust assets had been invested or sustained any injury for mismanagement thereof. This is so because the Trust provided no means or circumstances under which Trust assets

could have been distributed to plaintiffs during Gillespie's lifetime. Their interest was only in the Trust assets remaining at Gillespie's death when the Trust terminated. Their claim herein, however, is predicated on the diminution in value of the assets received by them in 1988 as a result of the prior finagling.

However, this issue need not be determined, as the prior holding resolves the statute of limitations question.

Defendants also argue plaintiffs' claim is barred by the doctrine of laches.

The doctrine of laches is an equitable principle designed to bar stale claims. *Dutoit v. Board of Johnson County Comm'rs,* 233 Kan. 995, 1001, 667 P.2d 879 (1983). Relief is denied on the ground of laches when a party neglects to assert a right or claim for an unreasonable and unexplained length of time and the lapse of time and other circumstances cause prejudice to the adverse party. *Capitol Fed'l Savings & Loan Ass'n v. Glenwood Manor, Inc.,* 235 Kan. 935, 938, 686 P.2d 853 (1984); *Kirsch v. City of Abilene,* 210 Kan. 749, 751-52, 244 Pac. 1054 (1926). The mere passage of time, however, is not enough to invoke the doctrine of laches. *Ten Eyck v. Harp,* 197 Kan. 529, 534, 419 P.2d 922 (1966). For laches to apply, the court must consider the circumstances surrounding the filing of the suit and any disadvantage to the other party caused by the plaintiff's delay. *Dutoit v. Board of Johnson County Comm'rs,* 233 Kan. at 1001; *Potucek v. Potucek,* 11 Kan. App. 2d 254, 260, 719 P.2d 14 (1986).

The plaintiffs herein moved promptly to bring this action upon learning of the facts, as previously stated. Gillespie's failure to bring the action cannot be utilized to bar the plaintiffs from bringing the action herein. We find no merit in this issue.

## STANDING

For their next issue, defendants contend the trial court erred in concluding the plaintiffs have standing to bring this action. They base this issue on language in the Trust instrument which states:

"(d) The Trustees are vested with full and complete legal and equitable title to all of the property and estate hereby transferred and entrusted to them until the termination of such trust and until such trust property shall be actually paid over, transferred and delivered to the person or persons designated as beneficiaries hereunder. No person entitled as beneficiary

hereunder—either to the body or corpus of said property upon the termination of said trust or to the income, increase or increments thereof or therefrom during the continuance thereof—shall individually take or have any title to or interest in such body or corpus or income, increase or increments until the same shall be actually received in possession by any such beneficiary. No disposition, charge or encumbrance by way of anticipation of such trust property or estate or otherwise or the income, increase or increments therefrom, or any part of the trust estate, by any person who may be designated as or become beneficiary hereunder, shall be of any validity or legal effect, or be in anywise regarded by said Trustees, nor (until actually and individually received in possession by any such beneficiary) shall the interest of any beneficiary be in any way liable for or subject to any claim or lien of any creditor or of any other person to whom such beneficiary may be, or claimed to be, in any way obligated or liable."

Defendants argue that as under the Trust instrument both legal and equitable title were vested in the trustees, plaintiffs had no claim of ownership when the investments were made in Arrowhead. Accordingly, they have no claim of ownership upon which to base this action.

In *Blackwell v. Blackwell*, 88 Kan. 495, Syl. ¶ 1, 129 Pac. 173 (1913), this court said, "A trust in real estate implies a holding of the legal title by one for the benefit of another who holds equitable title." This is supported by the Restatement (Second) of Trusts § 2 (1957) which defines what a trust is:

"A trust, as the term is used in the Restatement of this Subject, when not qualified by the word 'charitable,' 'resulting' or 'constructive,' is a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it."

Comment (f) to this section provides:

"In a trust there is a separation of interests in the subject matter of the trust, the beneficiary having an equitable interest and the trustee having an interest which is normally a legal interest."

Restatement (Second) of Trusts § 341 (1957) provides:

"(1) Except as stated in Subsection (2), if the legal title to the trust property and the entire beneficial interest become united in one person who is not under an incapacity, the trust terminates."

Appellants suggest the doctrine of merger applies.

Merger was discussed in *Fry v. McCormick*, 170 Kan. 741, 228 P.2d 727 (1951), in which this court held that the same person

cannot be at the same time sole trustee and sole beneficiary of the same identical interest, and that a trust cannot exist where the legal and beneficial interests are in the same person. The court concluded, however, that this rule does not apply to a situation where several beneficiaries of a trust, whose interests therein are not common to each other, are also trustees. This court reasoned that each is a beneficiary for the other's interests, which separates legal and equitable title. 170 Kan. at 742-43.

Throughout the trust instrument, the term "beneficiaries" is used rather than "beneficiary." Yet, by its terms, only Gillespie can receive trust assets or income (with the approval of the co-trustee). Plaintiffs herein receive only trust assets remaining after the Trust terminates upon the death of Gillespie. Yet, the modification of the Trust instrument executed shortly after the execution of the Trust states:

"WHEREAS, under date of April 20, 1956, Warren E. Brown as Settlor and Warren E. Brown, Pauline Brown Gillespie and Dorothea Brown Wofford as Trustees *entered into a certain Trust Indenture primarily for the benefit of the children of Pauline Brown Gillespie* as provided in paragraph (c), Item Three thereof . . . ." (Emphasis added.)

The Trust herein operated as, and was treated as, a trust during the 30-plus years of its existence. It appears rather late for a claim to be made that it never truly was a trust because legal and equitable title was vested in the trustees. Despite the odd language concerning the vesting of legal and equitable title in the trustee, we agree with the trial court that it was a valid trust and that plaintiffs have sufficient interest as beneficiaries and/or remaindermen to bring this action.

## EFFECT OF PRIOR COURT OF APPEALS DECISION

The defendants contend that the prior Court of Appeals decision herein, relative to plaintiffs' claims against the defendant accountants, decided some issues in their favor. The prior decision, *Gillespie v. Seymour*, 14 Kan. App. 2d 563, 796 P.2d 1060 (1990), involved plaintiffs' appeal from the trial court's dismissal of their claims against the defendant accountants therein. The case before us was tried in March 1990. The Court of Appeals decision was filed on May 4, 1990. Plaintiffs contend the Court

of Appeals decision limits any judgment against defendants herein to recovery for overcharges of expenses. We do not agree.

The claims against the defendants are broader than those against the accountants. Liability of the accountants is predicated upon alleged overcharging of expenses to the estate, and recovery of damages was sought on several theories. Liability on contract was rejected as there was no contractual relationship between the plaintiffs and the accountants. Conversion was held to be not viable as plaintiffs had no right of possession in the trust funds. The Court of Appeals held: "The Beneficiaries may, however, maintain an action for breach of trust against the Accountants for conspiracy to overcharge the trust account and participation in overcharging the account." 14 Kan. App. 2d at 572.

In the case before us, overcharging the trust account is only a portion of the claim. The trial court found, in essence, that Seymour systematically engaged in a plan to allocate worthless or low value oil and gas interests to the Trust in exchange for its investments in the company he dominated, Arrowhead. In so doing, he assigned to his wife (Dorothea) and other favored entities the more valuable interests. The claim against Dorothea arises from her fiduciary duties as co-trustee and alleged involvement in a conspiracy. We find nothing in the Court of Appeals decision which restricts or limits the judgment entered herein.

## PAUL SEYMOUR, III

Appellants contend that no basis for liability against Paul Seymour, III, was established. Paul Seymour, III, is the son of Dorothea and Seymour.

The trial court made the following pertinent findings of fact:

"54. Seymour selected wells for Dorothea, Paul Seymour III . . . and himself and selected the percentages. Seymour decided who among the Arrowhead and Big Springs . . . employees and shareholders would receive a carried interest on a well, but made no written record of it. Seymour III is not liable for any losses to Trust until he joined Arrowhead and Big Springs. This occurred in the summer of 1979.

. . . .

"88. Seymour owned a majority interest in Big Springs and received a salary from it. Seymour was president from 1978-1984. Although Paul Seymour, III was president from 1985 through 1988, it was under the overall dominance of Seymour.

. . . . . .

"100. Seymour and Paul III made the entries of percentages of well ownership on the 1984 spreadsheet. The money in excess of 'proportionate' billings was allocated by Seymour, Paul III and Burdge.

. . . .

"212. Seymour III was aware of, participated in, and continued to justify the spreading of funds, adjustment of interests and over billings at all times, including during the trial of the case. He testified in effect, 'that anything goes in the oil business.' This position is contrary to the statement by the expert witness, Remshberg, 'of conducting prudent operating practices and procedures, as well as maintaining fiduciary responsibilities.' "

Big Springs Drilling was organized in 1977.

As to the compensatory damages entered against Seymour III · the trial court held:

"The Court, therefore, finds that Dorothea Wofford Seymour, Paul A. Seymour Jr., Paul Seymour, III and Arrowhead Petroleum, Inc. are culpable as conspirators and are jointly and severally liable for damages assessed herein by the Court; provided, however, that Paul Seymour, III, shall be assessed no liability for any year prior to 1979, the Court finding his having commenced employment with Arrowhead Petroleum, Inc. and Big Springs Drilling, Inc. in the summer of 1979. For purposes of determining the liability of Paul Seymour, III, the Court finds that 12.08 percent of the plaintiffs' damages under the Court's computation had accrued during the years from ·1974 through 1978 and that, therefore, his joint and several liability is limited to 87.92% of the total damages assessed by the Court."

The issue of the sufficiency of the evidence supporting entry of the judgment for compensatory damages against Seymour III is a close one. Over and over in the trial court's findings we have the picture of Seymour being the orchestrator of the wrongdoing. He is the finagler in the allocation of the Trust's investments in oil and gas interests. He is the individual who determined the overcharging of the expenses to the Trust. The defendants characterize Seymour III's role as a clerical one. He was simply following the instructions of his father, Seymour. The trial court, however, found he was a participant in the wrongdoing and a fellow conspirator with Seymour. With due regard for the limited role an appellate court plays in reversing a trial court's findings of fact, we conclude that no error has been demonstrated in this issue.

## EXPERT WITNESS

In this issue, defendants argue as follows:

"Plaintiffs' accounting expert, Gary Gibbs, submitted his expert report to defendants in October of 1989, in accordance with the scheduling order of the trial court. Defendants' accounting expert, J. Fred Kubik, evaluated that report and assisted defendants in identifying mistakes and conceptual points of dispute. Gibbs was deposed on February 21, 22, and 23, just days before trial began on March 6, 1990. At that time, he did not amend or add to his October 17 report.

"Late in the afternoon of Sunday, March 4, just two days before trial, counsel for plaintiffs hand delivered Gibbs' new expert report to counsel for defendants. The new report contained extremely damaging conclusions and misinformation, but, because of the impending trial, defendants were precluded from digesting, evaluating, and responding adequately. Although defendants strenuously objected to the admission ·of the new report, the trial court admitted it into evidence."

Defendants then point out an error in the revised report.

Plaintiffs contend that defendants did not object to the report itself (Exhibit 77) at trial and only objected to a yearly summary gleaned therefrom (Exhibit 78). The objection and the ruling thereon were as follows:

"It is sort of a written series of opinions and observations that are in addition to what he testified to and the (sic) tends to over-emphasize it and adds new material.

"THE COURT: Well, I will receive it for what it is worth."

In their reply brief, defendants admit they did not object to Exhibit 77, but contend the admission of Exhibit 78 was erroneous.

The admission of expert testimony lies within the sound discretion of the trial court. *Holly Energy, Inc. v. Patrick*, 239 Kan. 528, Syl. ¶ 3, 722 P.2d 1073 (1986).

We find no abuse of discretion in the particulars alleged.

## COMPENSATORY DAMAGE AWARD

The method used by the trial court in determining compensatory damages is challenged in both the appeal and the cross-appeal.

Before proceeding to the parties' particular complaints concerning the method of computation utilized, a discussion of the problems present in this case which complicated the computation of damages and the method selected by the trial court to accomplish the same is appropriate. Reduced to its barest terms, the plaintiffs' claim is that the estate received less than that for which

it bargained. By virtue of being overcharged on expenses and Seymour's finangling in the allocation of the Trust's interest in leases, the Trust received less than it should have for its investment. Ordinarily, damages would be calculated by awarding to the plaintiffs the benefit of the bargain. That concept is fraught with problems in the case herein. Many records are available as to what the Trust invested, what expenses it was charged, and what interests it received. But at the heart of the claims herein is the disparity between what the Trust paid for expenses and the interests received *as compared with what other investors paid* for expenses and the interests *they* received.

Over the 14-year period herein, many different wells and many different investors and combinations of investors were involved. Records on these other investors are, in substantial part, unavailable as they were not maintained by Arrowhead. Further, the inherently risky nature of oil and gas investments makes comparisons difficult. There is a substantial chance factor. Because of the way Seymour handled the Trust's block investments, such as allocating a leasehold interest to the Trust *after* a dry hole had been drilled, the deck was stacked against the Trust, negating the chance factor. But some other investors, including Seymour and members of his family, had their risk reduced by this same finagling. Figuring damages on a transaction-by-transaction basis in comparison to other Arrowhead investors would be, under the circumstances, a formidable and probably impossible task by virtue of the lack of records and the risk or luck factor.

The trial court's findings include many specific instances in which the Trust's block investments were improperly charged by Seymour. It found that Arrowhead billed its working interest holders disproportionately 95 percent of the time. Illustrative of disparity in the assignment of interests is the fact that the Trust had two producers in 130 wells while Seymour had 19 producers in 103 wells, and Dorothea had 10 producers in 40 wells. Finding No. 93 is illustrative of the situation, reproduced in part as follows:

"Most striking is the 28-well Dean Miller venture in which Trust and Pauline cumulatively were in all of the 19 dry holes but not a single producer, while Seymour was in each of the nine producing wells but only one dry hole. This is true notwithstanding Seymour's testimony that each well was discussed before drilling."

In its award of damages, the trial court stated:

"1. Computation of damages is always a problem. Classically, and traditionally, tax considerations do not figure into a determination of damages. Trust was ravaged by the fashion in which the so-called block investment plan was administered. The Court determines that this administration was so bad and so blatant that all of the investments are to be treated as void at the time they were made. If Trust had not made block investments, those funds would have been subject to tax at the maximum combined rate deduction of tax which leaves an amount available for investment. The Court finds that had Seymour not been in the oil business, trust funds would have been invested as other trust funds. Such investments had an average year return, according to Gibbs, of 13.948% for each year. The Court determines that such funds would have been available for one-half year for investment. Then after the first year there was a principal amount available for investment the entire year with the expected return of 13.948%. In addition, there was a new amount available for investment for one-half year.

"2. This compounding of return is stopped with the end of 1987. Gillespie died in February, 1988. At this time, the total of the block investment's computed return is $2,477,422 (all figures being rounded according to the nearest dollar). Since the recovery is subject to tax the amount of 'block investments' after taxes must be increased by an amount which will return that amount to plaintiffs since, for computation purposes, the tax has already been paid but there is no basis recognizable by the IRS in the damage recovery. This amount is figured by the following formula:

$$X - .4343 X = \$1,098,848.$$

"X is an amount which, when subjected to the combined tax rate, stated as a decimal, .4343 will give the total amount of block investments after taxes. Therefore, $843,607 is to be added to the following computations of damages. The computation of damages is as follows: [*The chart is reproduced as an appendix to this opinion.]

"3. Therefore, damages are the total of $2,476,422 plus tax allowances on funds discounted for past taxes of $843,607 for total damages of $3,320,029.00. Interest is to be computed at the statutory rate from and after January 1, 1988."

In essence, the trial court voided all the Trust's Arrowhead investments from and after 1974, took off the tax savings made each year as a result of the investments, computed what the Trust would have made in the after-tax investments of part of the Trust's stock and bond portfolio, and allowed for income tax on the judgment. This, the trial court concluded, would make the Trust whole for the damage it had sustained.

Defendants complain that the measure of damages was improper in a number of respects. First, they argue that the trial

court was imposing the prudent man rule on a trust that by its express language granted unlimited discretion in the investments. The trial court did not void the investments because they were in oil and gas, but rather on the basis of the misuse of the block investments. In essence, it held the Trust was systematically cheated in the way Arrowhead and Seymour applied the investment funds. There is no finding the Trust lacked authority to make oil and gas investments.

Next, the award is challenged on the basis it is pure speculation that had oil and gas investments not been made with Arrowhead, then the after-tax dollars would have been invested in stocks and bonds. The Trust had, essentially, three types of investments during the period in question: (1) stocks and bonds; (2) bank stock; and (3) oil and gas through Arrowhead. After-tax profits from (1) and (2) were reinvested in (1) and (3). We do not believe it is too speculative to assume if investments in Arrowhead had ceased, all after-tax profits would have been treated the same. The rate of return on such investments was an established average of 13.948 percent. The defendants characterize this as an award of prejudgment interest which they say was inappropriate as the claim was not liquidated. As shown by the trial court's findings, the 13.948 percent compounded computation was not an allowance of prejudgment interest on a damage award, but rather an element in computing the damage sustained. The trial court allowed it to make the injured party whole.

Next, the defendants complain that the trial court erred in refusing to give them credit for the $572,069 in gross oil and gas income produced by the Trust's wells. The difficulty here is that this income did not go to the Trust; it was shown to have been utilized for expenses incurred in the oil and gas investments. In other words, the Trust was not enriched by such sum. It was reinvested by Arrowhead and/or eaten up in other expenses. This is reflected by an accountant's report showing investments were less than the income tax deductions claimed each year. The gross profits figure remained in the Arrowhead pot.

Plaintiffs, on the other hand, argue the trial court erred in figuring damages based upon the after-tax amount available for investment (column 5 of appendix) as opposed to the amount of investment (column 2 thereof). We find no merit in this argument.

The trial court was attempting to make the Trust whole. Had the Trust not been investing in oil and gas, the taxes shown in column four would have been paid and the Trust rendered poorer by such sums. To compute damages as suggested by the plaintiffs would result in a gigantic windfall to them. Their measure of damages is the diminution in value of the trust assets they received. The column four taxes did not diminish the Trust.

Plaintiffs further argue that the allowance for taxes on the recovery should have been figured on the basis of average tax rates for the years 1974 through 1987 (58.42 percent) rather than the 1987 tax rate (43.43 percent). We find this argument to be without merit. As stated, this allowance is for taxes on *the recovery*. What the tax rate might have been in prior years is of no consequence.

In assessing damages it is within the discretion of the trial court to apply equitable standards in order that the plaintiff may be made whole. *Seaman U.S.D. No. 345 v. Casson Constr. Co.*, 3 Kan. App. 2d 289, Syl. ¶ 2, 594 P.2d 241 (1979). The trial court's goal, appropriately, was to make the plaintiffs whole. *State ex rel. Stephan v. Wolfenbarger & McCulley, P.A.*, 236 Kan. 183, 189, 690 P.2d 380 (1984). In this unusual and complex factual situation, the trial court fashioned a remedy to accomplish this goal. Our test on appellate review is not whether the remedy fashioned is the best remedy that could have been devised, but whether the remedy so fashioned is erroneous as a matter of law or constitutes a breach of trial court discretion. After careful consideration and review, we find no error or abuse of discretion in the computation of damages.

## PUNITIVE DAMAGES

Defendants next contend that: (1) any award of punitive damages was unwarranted in this case; (2) the awards of punitive damages were excessive and contrary to the requirements of K.S.A. 1990 Supp. 60-3701.

The punitive damage awards were as follows:

For the period prior to July 1, 1987

| | |
|---|---|
| Dorothea: | $2,000,000 |
| Seymour: | $2,000,000 |
| Seymour III: | $ 25,000 |

For the period after July 1, 1987

Dorothea and Seymour,
      jointly and severally:        $    89,250.

In Kansas, punitive damages are awarded to punish the wrong-doer for his malicious, vindictive, or willful and wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs. *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, Syl. ¶ 6, 755 P.2d 1319 (1988).

At this point, we must examine the evidence and determine whether the evidence supports an award of punitive damages against the defendants. Such determination must be on an individual basis.

### DOROTHEA

Dorothea was a co-trustee and a 49 percent owner of Arrowhead. The trial court found that Dorothea was knowledgeable on the stock market and that Gillespie conferred with her on Trust investments in the stock market. Gillespie had the final word on all investments. During the period of Dorothea's co-trusteeship, the value of the stock portfolio rose significantly. No fault or blame is alleged against Dorothea relative to stock investments.

The trial court further found that Dorothea did not actively participate in Arrowhead and did not confer with Gillespie on the Trust's investments in Arrowhead. Gillespie conferred with Seymour on oil and gas investments. Gillespie determined what block investments would be made with Arrowhead each year, had the checks made out, signed them, and sent same to Dorothea for her signature. Dorothea neither saw nor signed the Trust's income tax returns nor participated in their preparation until after the death of Gillespie (Dorothea signed the final Trust tax return). All trust records were kept by Gillespie. Dorothea's mother and predecessor trustee, Dorothy Brown Wofford, deferred to Gillespie on all Trust decisions, including investments in Arrowhead. Dorothea continued that policy.

Arrowhead and Dorothea did profit from the finagling of trust interests orchestrated by Seymour. From this fact, the trial court concluded that Dorothea was a co-conspirator with Seymour and awarded punitive damages against her. We find the evidence insufficient to support the trial court's finding that Dorothea was

a co-conspirator and inconsistent with the trial court's other findings that Dorothea's role was purely passive relative to the oil and gas investments.

As a co-trustee, Dorothea had a duty to be informed on all Trust business and to act in the best interests of the Trust. She knew the Trust was investing in Arrowhead, a company in which she owned a substantial interest. She should have exercised heightened diligence in ascertaining whether such investments were in the Trust's best interests. She failed to perform her duties as a co-trustee when she left the oil and gas investment matters to Gillespie. For this she has liability for compensatory damages. There was no evidence that Dorothea's actions or inactions were malicious, vindictive, willful, or wanton. The awards of punitive damages against Dorothea are held to be improper and are reversed.

### PAUL SEYMOUR, III

The evidence herein portrays Paul Seymour, III, as a young man who entered the oil and gas business through his parents' interests therein. The father is clearly the dominant figure in the business. Seymour III followed his father's directions without question as to the disproportionate billings and, obviously, accepted his father's code of business ethics, which was shown by the evidence herein to be deficient in a number of significant respects. The trial court made no finding that Seymour III's actions or inactions were malicious, vindictive, or a willful or wanton invasion of another's rights. We find no evidentiary basis for an award of punitive damages against Seymour III, and the same must be reversed.

### SEYMOUR

Seymour's conduct relative to the Trust's investments in Arrowhead has been discussed extensively elsewhere in this opinion and little would be gained by its repetition herein. It is sufficient to say that his egregious conduct as found by the trial court is legally adequate to support a punitive damage award.

This brings up to examination the amount of the punitive damage awards entered against Seymour.

K.S.A. 1990 Supp. 60-3701 provides, in pertinent part:

"(e) Except as provided by subsection (f), no award of exemplary or punitive damages pursuant to this section shall exceed the lesser of:

(1) The annual gross income earned by the defendant, as determined by the court based upon the defendant's highest gross annual income earned for any one of the five years immediately before the act for which such damages are awarded; or

(2) $5 million.

"(f) In lieu of the limitation provided by subsection (e), if the court finds that the profitability of the defendant's misconduct exceeds or is expected to exceed the limitation of subsection (e), the limitation on the amount of exemplary or punitive damages which the court may award shall be an amount equal to 1½ times the amount of profit which the defendant gained or is expected to gain as a result of the defendant's misconduct.

"(g) The provisions of this section shall not apply to any action governed by another statute establishing or limiting the amount of exemplary or punitive damages, or prescribing procedures for the award of such damages, in such action.

"(h) As used in this section the terms defined in K.S.A. 60-3401 and amendments thereto shall have the meaning provided by that statute.

"(i) The provisions of this section shall apply only in an action based upon a cause of action accruing on or after July 1, 1987 and before July 1, 1988."

The trial court found the plaintiffs' cause of action herein accrued in August 1987. Without stating any legal basis therefor, the trial court circumvented the operation of the statute by entering two separate punitive damage awards based on the effective date of the statute (July 1, 1987). The award for punitive damages based on conduct occurring prior to July 1, 1987, was made without application of the statute, and the post-July 1 award was presumably in compliance with the statute, although we cannot see from the record the basis for the $89,250 calculation.

We hold that the determination of the punitive damage award against Seymour was erroneous. Only one award of punitive damages may be entered, and it must be made in accordance with the mandates of K.S.A. 1990 Supp. 60-3701. The awards of punitive damages entered against Seymour must be reversed and the case remanded for entry of a punitive damage award determined pursuant to K.S.A. 1990 Supp. 60-3701.

## INDEMNIFICATION BY GILLESPIE ESTATE

Dorothea filed a third-party petition against the Estate of Pauline Brown Gillespie, seeking indemnification for any amount she

might be found liable for herein. This was denied by the trial court, and Dorothea contends this was error. This was based on the trial court's conclusion of law that "[s]ince both trustees were at fault, the court determines that Dorothea was more at fault, therefore, there is no recovery over against Gillespie's estate. Restatement, Trusts paragraph 258."

Dorothea contends that this determination is not only not supported by the evidence, but it is contrary to the trial court's own findings of fact. We agree. The trial court found Dorothea's role in the Trust's investments in Arrowhead to be passive and that she did not participate in the actual running of Arrowhead. A central thread runs throughout the trial court's findings of fact—namely that Gillespie was the dominant trustee and had the final say on all trust investments. Gillespie worked with the accountants; Gillespie had the records of the Trust; Gillespie signed the tax returns; Gillespie determined how much would be invested in Arrowhead each year; and Gillespie directed that plaintiffs not be informed of Trust business. It was Gillespie who conferred with Seymour, visited the Arrowhead offices, studied oil and gas development reports, and visited drilling sites. The trial court found Gillespie had no knowledge that Seymour was stacking the deck against the Trust in its block investments through his finagling, but also found Gillespie had done some finagling of her own. Namely, she caused valuable oil interests belonging to the Trust to be transferred to her own account in exchange for less valuable interests she owned individually. From the information she had available to her, Gillespie had to have been aware the Trust's investments in Arrowhead were the equivalent of pouring money into a hole in the ground. She could have stopped investing in Arrowhead at any time, but continued to do so until the very end of her life. She commenced investing in Arrowhead to reduce tax liability. That it did accomplish.

The Restatement (Second) of Trusts § 258 (1957) provides:

Contribution or Indemnity from Co-trustee

"(1) . . . [W]here two trustees are liable to the beneficiary for a breach of trust, each of them is entitled to contribution from the other, except that

(a) if one of them is substantially more at fault than the other, he is not entitled to contribution from the other but the other is entitled to indemnity from him. . . ."

Weighed against all of the trial court's findings of Gillespie's dominance in the Trust's investments, we have the findings of Dorothea's improperly passive role of deferment to Gillespie plus the fact the investments were being made in Dorothea's company and the heightened diligence she should have exercised on such investments. After careful consideration, we conclude that the co-trustees were equally at fault and Dorothea has no right to indemnification. However, she is entitled to contribution from the Gillespie estate of one-half of any portion of the judgment against her which she pays—the term judgment to include interest on the judgment and costs.

## LETTER OF CREDIT

A final issue from the plaintiffs' cross-appeal remains to be determined. After the trial court entered its award for compensatory damages herein, the defendants filed a notice of appeal therefrom. The trial court approved a letter of credit filed by defendants and stayed execution of the judgment. Shortly thereafter, the Court of Appeals dismissed the appeal as being interlocutory, the appeal having been taken prior to the hearing on and award of punitive damages. After the dismissal of the appeal, the trial court then released the letter of credit. Defendants then filed Chapter 11 bankruptcy pleadings and were granted a stay of execution from the bankruptcy court.

The plaintiffs have wholly changed their position on the premature appeal. Plaintiffs took the position before the Court of Appeals that the initial appeal was premature as no final judgment had been entered. The Court of Appeals dismissed the appeal on that grounds. Now, plaintiffs, in essence, seek to validate the earlier appeal in order to take advantage of the letter of credit which was filed in connection with that appeal.

No error or abuse of discretion in the trial court's release of the letter of credit has been shown. We find the issue to be without merit.

The judgment is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

LOCKETT, J., concurring and dissenting: I concur with the majority except as to its holding that (1) the co-trustee, Dorothea, and Paul Seymour, III, should not be assessed punitive damages, and (2) the trial court did not abuse its discretion in releasing defendant's letter of credit.

The majority acknowledges that Dorothea owned 49% of the stock in Arrowhead and she profited from that corporation. The majority reasons that since Dorothea did not actively participate in Arrowhead and did not confer with Gillespie or her husband about the Trust investments in Arrowhead, she was not responsible for their acts. The majority asserts that Dorothea, although she was aware she was profiting from Gillespie's acts, merely signed the checks which generated the profits for Arrowhead. The majority notes Dorothea also failed to check the Trust's income tax records, participate in their preparation, and review any Trust records until after the death of co-trustee Gillespie. After the death of that co-trustee, Dorothea continued the policy of investing Trust income in her corporation. The majority acknowledges:

"As a co-trustee, Dorothea had a duty to be informed on all Trust business and to act in the best interests of the Trust. She knew the Trust was investing in Arrowhead, a company in which she owned a substantial interest. She should have exercised heightened diligence in ascertaining whether such investments were in the Trust's best interests. She failed to perform her duties as a co-trustee when she left the oil and gas investment matters to Gillespie. For this she has liability for compensatory damages."

The majority asserts there was no evidence that Dorothea's actions or inactions were malicious, vindictive, willful, or wanton, and determined the award of punitive damages against Dorothea to be improper.

Punitive damages are allowed not because of any special merit in the injured party's case, but are imposed to punish the wrongdoer for malicious, vindictive, or willful and wanton invasion of the injured party's rights. The purpose of punitive damages is to restrain and deter others from the commission of like wrongs. *Gould v. Taco Bell*, 239 Kan. 564, Syl. ¶ 8, 722 P.2d 511 (1986).

When the administration of a trust is vested in co-trustees, they all form but one collective trustee, and they must exercise jointly all those powers that call for their discretion and judgment,

unless the trust instrument or declaration authorizes an apportionment of powers. A single co-trustee may, however, perform a purely ministerial act in the administration of the trust. 76 Am. Jur. 2d, Trusts § 299.

> "A trustee is under a duty to exercise due care, diligence, and skill with respect to watching his cotrustees and guarding the trust estate against their defaults and breaches of trust, and if he fails to do so, he is liable for all ensuing losses to the trust estate. The standard of such care, diligence, and skill required, as in other cases, is that of an ordinarily prudent man in the conduct of his private affairs.

> "A trustee fails in his duties in this respect where he hears of any fact tending to call his attention to the mismanagement or misapplication of trust funds by his cotrustee and fails to take any steps to safeguard the trust estate." 76 Am. Jur. 2d, Trusts § 332, p. 548.

The duty to administer a trust and to exercise the discretion vested in it rests on the trustee and cannot be delegated by a trustee to others. *Jennings v. Murdock*, 220 Kan. 182, Syl. ¶ 2, 553 P.2d 846 (1976). The law presumes good faith on the part of the trustee and careful exercise of judgment and discretion in the performance of his or her duties. *Prager v. Hart*, 106 Kan. 14, Syl. ¶ 4, 186 Pac. 1015 (1920). A trustee is bound to the utmost good faith, may acquire no interest adverse to the trust, and must exercise such care and diligence, in respect to the discharge of the trust, as, under all the circumstances, having regard to the magnitude of the trust and the interests involved, would be reasonable. *Morrow v. County of Saline*, 21 Kan. *484, Syl. ¶ 5 (1879).

Here, Dorothea's investments in Arrowhead were gaining her a producing oil and gas lease with taxable income 25% of the time. That is one out of four, whereas the trust gained a producing lease with taxable income one out of each 65 well investments. She also knew of the disparate billings and did nothing, in addition to the other acts or failure to act mentioned in the majority opinion. I would affirm the award of punitive damages against Dorothea.

As to Paul Seymour, III, the majority portrays him as a son who was dominated by his father. It acknowledges that Seymour III followed his father's directions without question when disproportionately billing the Trust. The majority asserts that the son accepted his father's code of business ethics and was deficient

in a number of significant respects. The majority fails to note that the trial judge found Seymour III was aware of, participated in, and continued to justify the spreading of funds, adjustments of interest, and overbillings at all times, including during the trial of the case. Seymour III testified "that anything goes in the oil business." The trial court observed that Seymour III's ethical conduct was contrary to the statement by the expert witness, Remshberg, "of conducting prudent operating practices and procedures, as well as maintaining fiduciary responsibilities" in the oil business.

In affirming the award of punitive damages against Paul Seymour, Jr., the majority states: "It is sufficient to say that his egregious conduct as found by the trial court is legally adequate to support a punitive damage award." The majority ignores the fact that Paul Seymour, Jr., was unable to control the assets of the Trust by himself. The majority gives no weight to the fact that to accomplish his goal, Paul Seymour, Jr., needed the willing and active assistance of Dorothea and his son. The trial court found that it was the actions of the three individuals working together that caused the damage to the Trust. The majority disregards the trial court's finding that there was a conspiracy, then reviews and reweighs the evidence and determines that punitive damages should be assessed against only one of the coconspirators, even though the other coconspirators, Dorothea and Seymour III, willfully breached duties owed to the injured parties and profited by their willful breach. I would affirm the award of punitive damages against Paul Seymour, III.

The issue concerning the letter of credit is not properly before this court. Many questions of fact are raised that may require the trial court to take evidence. I would not consider that issue at this time.

ABBOTT, J., joins in the foregoing concurring and dissenting opinion, and joins in the result in the remainder of the majority opinion.

## APPENDIX

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|
| Year | Amount of Deposit | Maximum Effective Tax Rate % | Amount of Tax on Deposit | Amount Available for Investment (Col. 1 minus Col. 4) | 1/2 Year Return (On Col. 5) | Investable Amount at Beginning of Year | Earnings for Year (On Col. 7) |
| 1974 | $120,000 | 63.23 | $75,876 | $44,124 | $3,077 | | |
| 1975 | 110,000 | 63.33 | 69,663 | 40,337 | 2,813 | $47,201 | $6,583 |
| 1976 | 110,000 | 66.02 | 72,622 | 37,378 | 2,613 | 96,934 | 13,520 |
| 1977 | 130,000 | 64.34 | 83,642 | 46,358 | 3,233 | 160,445 | 22,378 |
| 1978 | 130,000 | 68.09 | 88,517 | 41,483 | 2,893 | 232,414 | 32,417 |
| 1979 | 140,000 | 69.97 | 97,958 | 42,042 | 2,832 | 309,207 | 43,128 |
| 1980 | 160,000 | 71.98 | 115,168 | 44,832 | 3,153 | 397,209 | 55,402 |
| 1981 | 200,000 | 68.60 | 137,200 | 62,800 | 4,379 | 500,596 | 69,823 |
| 1982 | 150,000 | 57.18 | 85,770 | 64,230 | 4,479 | 637,607 | 88,933 |
| 1983 | 250,000 | 53.94 | 134,850 | 115,150 | 8,031 | 795,249 | 110,921 |
| 1984 | 293,000 | 53.60 | 157,048 | 135,952 | 9,481 | 1,029,351 | 143,573 |
| 1985 | 300,000 | 52.51 | 157,530 | 142,470 | 9,935 | 1,318,357 | 183,884 |
| 1986 | 300,000 | 53.15 | 159,450 | 140,550 | 9,802 | 1,654,646 | 230,790 |
| 1987 | 249,500 | 43.43 | 108,358 | 141,142 | 9,843 | 2,040,788 | 284,649 |

Amount of Damages (Total for 1987 of Columns 5, 6, 7 & 8) $2,476,422